JOHNSON, Circuit Judge:
 

 This is an appeal by William A. Borders from his conviction for his involvement in a conspiracy to solicit and accept a bribe in exchange for influencing the outcome of a case pending in the courtroom of his close friend, United States District Judge Alcee L. Hastings.
 
 [1]
 
 Both Judge Hastings and Borders were indicted for conspiracy and for corruptly impeding the administration of justice; Borders alone was also indicted for unlawfully travelling in interstate commerce with intent to commit bribery.
 
 [2]
 
 Borders’ trial was severed from that of Hastings,
 
 [3]
 
 and venue was changed from the Southern District of Florida to the Northern District of Georgia. At trial, to support the conspiracy count against Borders the government introduced evidence as to the so-called flight of Judge Hastings on the day that Borders was arrested. Borders’ defense consisted primarily of denying any conspiratorial involvement by Hastings and of introducing several character witnesses who testified in support of Borders. The jury found Borders guilty on all four counts, and he was sentenced to four concurrent five year prison terms and fined a total of $35,000. In this appeal, Borders cites as trial error the admission of the flight evidence, the jury instruction on flight, and the jury instruction on character evidence. We affirm.
 

 I.
 

 In December 1980, Frank Romano and Thomas Romano were convicted after a jury trial in Judge Hastings’ courtroom of twenty-one counts of racketeering and related charges. On May 4, 1981, Judge Hastings ordered the forfeiture of $1.2 million worth of the Romanos’ racketeering-related property under 18 U.S.C.A. § 1963(a), the' forfeiture provision of the Racketeer Influenced and Corrupt Organizations statute.
 
 [4]
 
 After receiving certain tips from an informant named William Dredge, who was a former client of Borders, the FBI in September 1981 began an investigation into the Romano proceedings.
 

 In the presence of an FBI agent, Dredge called Borders on September 10, 1981, and, after telling Borders “My men are ready to deal,” arranged to meet him at Miami International Airport on September 12 for the purpose of introducing him to Frank Romano. Borders later that day placed two calls
 
 *1320
 
 to Judge Hastings’ chambers in Miami.
 
 [5]
 
 The next day, September 11, FBI agents followed Judge Hastings from the United States Courthouse in Miami to the airport. Two short calls from pay telephones at the airport to Borders’ office were charged to Hastings’ home telephone. At 4:20 p.m., Borders’ secretary took a message for Borders from Hastings that read “Flight further delayed, not leaving until 5:00.” Hastings arrived that night at Washington National Airport at about 8 p.m. Borders, who apparently had been scheduled to leave National Airport for Miami at 7:30 p.m., changed his flight so as to depart at about 9:25 p.m. — thus providing Borders and Hastings with time to meet at National Airport.
 

 For the September 12 meeting in Miami with Borders, the FBI selected retired FBI agent Paul Rico to pose as Frank Romano. Dredge, Rico, and Borders met at 8:40 a.m. at the Miami airport restaurant. Dredge introduced Rico to Borders, telling Borders “You’re in good hands,” and then left Rico and Borders alone. According to a tape of their conversation,
 
 [6]
 
 Borders asked Rico, “You know what the number is, right?” After Rico hesitated, Borders wrote “$150,-000” on a piece of paper and then wrote “within ten days an order will be signed returning a substantial amount of property.” Borders also told Rico that the “other” —apparently meaning reduced prison sentences for the Romanos — would come after Rico (Romano) withdrew a pending appeal and filed a motion in district court for mitigation of sentence. Rico hesitated, so Borders offered to have Dredge hold the money “until the first part is done,” explaining, “[I] don’t want you filing a motion and withdrawin’ your appeal without know-in’ somethin’ gonna be done.” Rico objected to using Dredge, preferring to deal directly with Borders, and suggested that he and Borders agree upon some procedure whereby Borders could prove his influence with Judge Hastings. Apparently Borders had previously suggested that Rico name a time and place for Hastings to eat dinner; Rico now repeated this suggestion.
 
 [7]
 
 ‘ Rico named the main dining room at the Fon-tainbleu Hotel in Miami Beach at 8 p.m. on September 16. Before the two departed, they agreed to meet again at the same location at 10 a.m. on September 19, so that Rico could “put something up front.”
 

 On September 16, FBI agents observed Judge Hastings arriving for dinner at the main dining room of the Fontainbleu Hotel at 7:45 p.m. — just as Rico had suggested.
 

 Borders and Rico met for the second time as planned at the Miami airport on September 19. After Borders told Rico that the Romano property would be released within ten days, he instructed Rico on the proce
 
 *1321
 
 dure to be used for obtaining mitigation of sentence.
 
 [8]
 
 Rico then gave Borders an envelope containing $25,000 in $100 bills as “up front” money; they agreed that the remainder was to be paid at a later time.
 
 [9]
 

 There was no further contact between Rico and Borders until Rico called Borders at 3:10 p.m. on Friday, October 2, shortly after the government had installed court-authorized wiretaps on Borders’ home and office telephones. Rico inquired as to the status of the forfeiture order; Borders was uncertain as to what had happened and suggested that Rico call him at home on Sunday, October 4. Borders attempted to call Hastings a little over an hour after talking to Rico, but Hastings’ secretary indicated that he had left for the day.
 

 Rico called Borders again at 9:30 Sunday morning. Borders told Rico that he “ha[dn’t] been able to talk to anybody” and suggested that Rico call him at the office the next day. When Rico called Borders at 4:30 p.m. on Monday, October 5, Borders said that “the matter” had “been taken care of” and that Judge Hastings’ order probably would be mailed out “today or first thing in the morning.” Shortly afterwards, Judge Hastings called Borders and the following conversation occurred:
 

 BORDERS: Yes, my brother.
 

 HASTINGS: Yey, my man.
 

 BORDERS: Um hum.
 

 HASTINGS: I’ve drafted all those, ah, ah, letters, ah, for him ...
 

 
 *1322
 
 BORDERS: Um hum.
 

 HASTINGS: ... and everything’s okay. The only thing I was concerned with was, did you hear if, ah, hear from him after we talked?
 

 BORDERS: Yea.
 

 HASTINGS: Oh. Okay.
 

 BORDERS: Uh huh.
 

 HASTINGS: Alright, then.
 

 BORDERS: See, I had, I talked to him and he, he wrote some things down for me.
 

 HASTINGS: I understand.
 

 BORDERS: And then I was supposed to go back and get some more things.
 

 HASTINGS: Alright. I understand. Well then, there’s no great big problem at all. I’ll, I’ll see to it that, ah, I communicate with him. I’ll send the stuff off to Columbia in the morning. BORDERS: Okay.
 

 HASTINGS: Okay.
 

 BORDERS: Right.
 

 HASTINGS: Bye bye.
 

 BORDERS: Bye.
 

 The next day, October 6, Judge Hastings issued an order which reversed in part the original $1.2 million forfeiture order, returning over $845,000 in forfeited property to the Romanos.
 

 Between the issuance of the original forfeiture order and the October 6 order, the Fifth Circuit handed down
 
 United States v. Martino,
 
 648 F.2d 367 (5th Cir., 1981),
 
 cert.
 
 denied, - U.S. -, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982), which reversed a forfeiture order similar to the one entered in the Romano case.
 
 [10]
 
 At the Romanos’ sentencing hearing on July 8,1981, Judge Hastings considered whether in light of
 
 Martino
 
 the May 4 order should be reversed. According to the transcript of the hearing and the testimony of the Justice Department attorney who prosecuted the Romanos, Hastings orally affirmed the May 4 order after hearing extensive argument as to the meaning of
 
 Martino.
 

 [11]
 

 About seven weeks after the hearing, the Fifth Circuit followed
 
 Martino
 
 in
 
 United States v. Peacock,
 
 654 F.2d 339, 351 (5th Cir. August 27, 1981). Judge Hastings’ law clerk told the judge about
 
 Peacock
 
 in early September, and Hastings responded by saying “give them [the Roma-nos] their money back.” As of October 5, however — the day of the Borders-Hastings telephone conversation reproduced above— the clerk had not completed work on the new order. On that day the judge went to the law clerk and told him to “Do the order ... I want the order today.” According to the clerk’s testimony, such behavior was “unusual” for Judge Hastings and “not in the ordinary course of things.” The order was drafted, typed, and mailed by 6:00 p.m. on October 6.
 

 Rico called Borders at midday on October 7, inquiring again about the status of the order; Borders told him that “It went out yesterday morning.”
 
 [12]
 
 Rico called again that night to tell him that he had received word of the order and was satisfied. They then discussed arrangements for the final payoff, which was to occur on October 9.
 
 *1323
 
 Rico offered to travel to Washington, which Borders agreed to, telling Rico to call when he got into town.
 

 A testimonial dinner in honor of Borders, who had been a president of the National Bar Association, was planned to take place in Washington on Friday evening, October 9. On Thursday, October 8, Hastings called Borders to tell him that he would arrive in Washington at 10:40 the next morning.
 
 [13]
 
 Borders picked him up at the airport on Friday morning and the two travelled to the L’Enfant Plaza Hotel, where a suite and an adjoining room had been reserved in their names. Shortly afterwards, Borders and Hastings went to Borders’ law office downtown, where Borders picked up a message to call “Frank” at the Twin Bridges Marriott Hotel in Washington.
 
 [14]
 
 Borders returned the call at 11:46 a.m.; Rico told Borders that “he had brought all the necessary papers.” They agreed to meet at once at the Marriott.
 

 Borders left Judge Hastings at the office and drove to the Marriott, arriving at Rico’s room less than an hour after they had talked on the telephone. When Rico answered Borders’ knock at the door, Borders asked Rico, “You got it with you?” Rico told him that “it” was in the room, and Borders said, “Get it, I want to take a ride.” The two got into Borders’ car and Rico placed a carrying bag containing $125,000 on the seat between them. The FBI pulled them over as soon as Borders started to drive out of the Marriott parking lot. When he saw the FBI car, Borders said to Rico, “We’re busted.”
 

 In the meantime, Judge Hastings had lunch in his hotel room and then drinks in the cocktail lounge at the L’Enfant Plaza with Hemphill Pride, a close friend of Hastings and Borders. Pride had come to Washington for the dinner in honor of Borders and was also staying with his family at the hotel. When Pride returned to his room he immediately received a phone call from John Shorter, who was Borders’ trial attorney. At trial Shorter asked Pride about their conversation. Pride testified as follows:
 

 The best I can recall, you told me — you asked me — did I know where the Judge was or could I get in contact with him? And I told you, yes, that he was either on his way to his room or in his room, and you then told me — described the situation that Mr. Borders had been arrested in Virginia and the best I can recall, you told me that the charges pending against Mr. Borders involved some bribery that took place in Judge Hastings’ courtroom. You then told me that the FBI was looking for Judge Hastings, and that they wanted to interview him, and you gave me the name of two FBI agents and a telephone number and asked me to give this message to Judge Hastings and tell him to contact these agents.
 

 You also told me to tell Judge Hastings that you thought that he should have counsel present at the time that he was interviewed, and you suggested a lawyer from Washington by the name of Ken Monday. You then told me that you were leaving your office to go to Virginia, I think you said a bond hearing, but I got the impression that whatever you were going to was something in order to try to get him out, which I considered a bond hearing.
 

 As soon as he finished his conversation with Shorter, Pride telephoned Hastings in his room and told him that he had an important message for him. The two met outside an elevator at the hotel and Pride related the contents of Shorter’s phone call to Hastings. According to Pride’s testimony, Hastings’ reaction was one of shock, as if “he didn’t
 
 *1324
 
 know which way to move or what to do.” Hastings asked Pride at least once what to do.
 
 [15]
 
 Pride told him that he could tell him nothing more than what was in the phone call. Hastings asked for Shorter’s telephone number, and Pride informed him that Shorter was with Borders. Pride then cautioned Hastings, “if you have got a problem, you would be in a better position on home court than here in Washington.”
 
 [16]
 
 The two then proceeded to Hastings’ room, where Pride helped Hastings pack his clothes. When Pride offered to give Hastings a ride to the airport, Hastings declined and said “You are with your family. I don’t want you to get involved. I will go on my own.”
 
 [17]
 
 Hastings made no phone calls in Pride’s presence, did not pay his hotel bill upon departing, and did not pick up a suit he had left at the hotel cleaners.
 

 Although the exact time of Hastings’ departure for the airport is uncertain, it was within thirty minutes to an. hour of when he first learned of Borders’ arrest. There was a 4:35 flight with seats available that afternoon from National Airport, which is four miles from the L’Enfant Plaza Hotel. Instead of travelling to National Airport, however, Hastings went to Baltimore-Washington Airport, 32 miles northeast of the hotel and over an hour away in Friday afternoon traffic.
 

 Hastings landed in Miami that night and proceeded to the home of Patricia Williams, his fiancee. He arrived there between 9:30 and 10:00 p.m. and told her to expect a visit from FBI agents. Soon afterwards, two FBI agents showed up and interviewed Hastings for two to three hours.
 

 II.
 

 Because only Hastings and Borders were named as conspirators in the indictment, the government had to prove Hastings’ involvement in order to convict Borders for conspiracy. Accordingly, the government introduced evidence at trial tending to prove that immediately after learning of Borders’ arrest Hastings fled from the L’Enfant Plaza Hotel. Appellant argues that the admission of this evidence was error because (1) evidence of flight is inherently unreliable and (2) the particular evidence in this case was too “uncertain and equivocal” to constitute flight. In reviewing these contentions, we note at the outset that “the ultimate decision on admissibility rests in the hands of the trial judge whose exercise of discretion in this regard will not be overturned absent clear abuse.”
 
 Scheib v. Williams-McWilliams Co.,
 
 628 F.2d 509, 511 (5th Cir.1980).
 

 Courts have long rejected the argument that evidence of flight is inherently unreliable. Over three quarters of a century ago, the Supreme Court announced that “the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt.”
 
 Allen v. United States,
 
 164 U.S. 492, 499, 17 S.Ct. 154, 156, 41 L.Ed. 528 (1896). We have on numerous occasions affirmed the validity of our statement in
 
 United States v. Ballard,
 
 423 F.2d 127, 133 (5th Cir.1970) (quoting Wigmore) that: “[I]t is today universally conceded that the fact of an accused’s flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.”
 
 17a
 

 See, e.g., United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars in United States Currency,
 
 661 F.2d
 
 *1325
 
 319, 324 (5th Cir.1981);
 
 United States v. Meneses-Davila,
 
 580 F.2d 888, 896 (5th Cir.1978);
 
 United States v. Stewart,
 
 579 F.2d 356, 359 (5th Cir.),
 
 cert. denied,
 
 439 U.S. 936, 99 S.Ct. 332, 58 L.Ed.2d 332 (1978);
 
 United States v. Myers,
 
 550 F.2d 1036, 1049-50 (5th Cir.1977) (dictum),
 
 appealed following remand,
 
 572 F.2d 506 (5th Cir.1978), ce
 
 rt. denied,
 
 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978);
 
 United States v. Bowers,
 
 458 F.2d 1045, 1048 (5th Cir.),
 
 cert. denied,
 
 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972);
 
 Vick
 
 v.
 
 United States,
 
 216 F.2d 228, 232 (5th Cir.1954). Other circuits have followed the same course.
 
 E.g., United States v. Martinez,
 
 681 F.2d 1248, 1256-59 (10th Cir.1982) (“The cases universally accept” the doctrine that flight evidence is admissible);
 
 United States v. Jackson,
 
 572 F.2d 636, 639-41 (7th Cir.1978) (dictum);
 
 United States v. Rowan,
 
 518 F.2d 685, 691 (6th Cir.),
 
 cert. denied,
 
 423 U.S. 949, 96 S.Ct. 368, 46 L.Ed.2d 284 (1975);
 
 United States v. Greiser,
 
 502 F.2d 1295, 1299-1300 (9th Cir.1974). Even courts that have expressed reservations as to the probative value of flight evidence have upheld its admission.
 
 See, e.g., United States v. Robinson,
 
 154 U.S.App.D.C. 265, 475 F.2d 376, 384 (1973).
 
 [18]
 

 Flight is viewed in the law of evidence as admission by conduct which expresses consciousness of guilt. E. Cleary,
 
 McCormick on the Law of Evidence
 
 § 271, at 655 (2d ed. 1972). Human experience teaches, however, that not every act of flight constitutes an expression of guilt. The Supreme Court explained long ago that:
 

 [I]t is not universally true that a man, who is conscious that he has done a wrong, “will pursue a certain course not in harmony with the conduct of a man who is conscious of having done an act which is innocent, right and proper;” since it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that “the wicked flee when no man pursueth, but the righteous are as bold as a lion.”
 

 Alberty v. United States,
 
 162 U.S. 499, 16 S.Ct. 864, 40 L.Ed. 1051 (1896).
 
 See also Wong Sun v. United States,
 
 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963) (quoting
 
 Alberty).
 
 Thus, the interpretation to be gleaned from an act of flight should be made cautiously and with a sensitivity to the facts of the particular case. Discussing evidence of flight in
 
 United States v. Myers, supra,
 
 550 F.2d at 1049, we indicated that:
 

 Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant’s behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
 

 The cases in which flight evidence has been held inadmissible have contained particular facts which tend to detract from the probative value of such evidence.
 
 See generally United States v. Martinez, supra,
 
 681 F.2d at 1257 (surveying cases). For example, in
 
 United States v. Myers, supra,
 
 we
 
 *1326
 
 held flight evidence inadmissible
 
 [19]
 
 where the defendant might have fled because of guilt feelings about a different and unrelated crime that he had committed.
 
 See
 
 550 F.2d at 1050. Moreover, the testimony of the arresting officers did not even clearly indicate that the defendant had in fact fled.
 
 Id.
 
 at 1049-50. An analogous situation occurred in the recent Fourth Circuit case of
 
 United States v. Beahm,
 
 664 F.2d 414, 419-20 (4th Cir.1981), which concluded that the trial court had committed error in instructing the jury on flight when at the time of his flight the defendant Beahm had been unaware that he was the subject of a criminal investigation.
 
 [20]
 
 Beahm fled shortly after receiving a note asking him to contact the FBI, but the note said nothing about wanting to arrest him or suspecting him of any crime, and it did not mention the incident in which Beahm allegedly was involved.
 
 See also United States v. Jackson, supra,
 
 572 F.2d at 641. The
 
 Beahm-Myers
 
 line of cases thus stands for the proposition that the probative value of flight evidence is substantially weakened if the suspect was not aware at the time of flight that he was the subject of a criminal investigation for the particular crime charged.
 

 The other line of cases in which flight evidence has been held inadmissible focuses on a related defect. In these cases, there exists a significant time delay from the commission of the crime, or the point at which the suspect becomes aware that he is the subject of a criminal investigation, to the time of flight. For example, in
 
 United States v. Myers, supra,
 
 550 F.2d at 1050-51, the defendant fled between three and six weeks after the crime. In
 
 United States v. Beahm, supra,
 
 664 F.2d at 420, the flight was three weeks after the crime.
 
 [21]
 
 A number of other cases in which the probative value of the flight evidence was doubted have pointed to similar lapses of time.
 
 See, e.g., United States v. Howze,
 
 668 F.2d 322, 324-25 (7th Cir.1982) (four and one half months);
 
 United States v. White,
 
 488 F.2d 660, 662 (8th Cir.1973) (five months);
 
 cf. United States v. Rowan,
 
 518 F.2d at 691 (flight instruction upheld where flight occurred thirty six hours after crime). When the flight is not immediate, the inference of a consciousness of guilt weakens. As we said in
 
 Myers, supra,
 
 “[t]he immediacy requirement is important. It is the instinctive or impulsive character of the defendant’s behavior, like flinching, that indicates fear of apprehension and gives evidence of flight such trustworthiness as it possesses.... The more remote in time the alleged flight is from the commission or accusation of an offense, the greater the likelihood that it resulted from something other than feelings of guilt concerning that offense.” 550 F.2d at 1051.
 
 [22]
 

 Reviewing the evidence concerning Hastings’ flight, we see no defects that would
 
 *1327
 
 render it inadmissible. Viewing the evidence in the light most favorable to the government,
 
 see Glasser v. United States,
 
 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the government sufficiently established Hastings’ activity on October 9 as flight. For example, his failure to call the FBI agents and his hasty, unplanned, and disorganized departure from the hotel support the inference that Hastings wanted to flee the scene.
 
 [23]
 
 Moreover, unlike the situation in
 
 Beahm,
 
 Hastings clearly was aware of the fact that the FBI had focused its investigation on him: Shorter’s message to Pride indicated that the FBI wanted to talk to Hastings about bribery in his courtroom, that Borders had been arrested in connection with the bribery, and that Hastings should have a lawyer present at the time of questioning. The message could not have been more specific without naming the amount and date of the alleged bribe. And unlike the flight in
 
 Myers,
 
 Hastings’ departure from the L’Enfant Plaza Hotel occurred as soon as he heard that the FBI wanted to talk to him. Thus, we conclude that it was proper to admit the evidence and let the jury determine its significance and qualitative value, if any.
 
 [24]
 

 In holding that the flight evidence was properly admitted, we do not suggest that this evidence alone was sufficient to show Hastings’ criminal involvement so as to support Borders’ conviction on the conspiracy count. Appellant does not raise a question as to the overall sufficiency of the evidence, but, to put the flight evidence into context, we note that the jury also had before it other circumstantial evidence tending to show that Hastings was involved — such as the timing and content of his telephone conversations with Borders.
 

 Finally, appellant argues that, even if the flight evidence was properly admitted, it was error to instruct the jury on the issue. Quoting from
 
 United States v. Robinson,
 
 154 U.S.App.D.C. 265, 475 F.2d 376, 384 (1973), he suggests that “[t]he interest of justice is perhaps best served if this matter [flight] is reserved for counsel’s argument, with little if any comment from the bench.” Yet the court in
 
 Robinson
 
 upheld a jury instruction on flight.
 
 Id.
 
 Further, we are aware of no case holding that such an instruction constitutes reversible error
 
 per se,
 
 and appellant offers no reason why we should adopt such a rule. To the contrary, we have consistently approved the inclusion of a jury instruction on flight.
 
 E.g., United States v. Stewart, supra,
 
 579 F.2d at 359 & n. 3;
 
 United States v. Clark,
 
 506 F.2d 416, 418 (5th Cir.),
 
 cert. denied,
 
 421 U.S. 967, 95 S.Ct. 1957, 44 L.Ed.2d 454 (1975);
 
 United States v. Register,
 
 496 F.2d 1072, 1077-78 (5th Cir.1974),
 
 cert. denied,
 
 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 819 (1975).
 

 The trial court instructed the jury as follows:
 

 There has been evidence in this case that on October 9, 1981, following Mr. Border’s [sic] arrest in Arlington, Virginia, Mr. Hemphill Pride informed Judge Hastings that Mr. Borders had been arrested in connection with an alleged bribery in Judge Hastings’ court and that FBI agents wished to interview him.
 

 The Government has argued to you that Judge Hastings’ departure from the L’Enfant Plaza Hotel in Washington and his return in Miami without contacting the FBI agents shows a consciousness of guilt on his part. I therefore instruct you as follows:
 

 Intentional flight by a person immediately after a crime has been committed or
 
 *1328
 
 after that person has been accused of a crime that has been committed is not, of course, sufficient in itself to establish the guilt of that person, but intentional flight under those circumstances is a fact which, if proved, may be considered by the Jury in the light of all the other evidence in the case in determining the guilt or innocence of that person.
 

 Whether or not Judge Hastings’ conduct constituted flight is exclusively for you, as the Jury, to determine. And if you do so determine whether or not that flight showed a consciousness of guilt on his part and the significance to be attached to that evidence are also matters exclusively for you as a jury to determine.
 

 I do remind you that in your consideration of any evidence of flight, if you should find that there was flight you should also consider that there may be reasons for this which are fully consistent with innocence. There may be many reasons for a person to be unwilling to be interviewed by law enforcement agents which are perfectly innocent reasons, and in no way show any consciousness of guilt on the part of that person.
 

 And may I also suggest to you that a feeling of guilt does not necessarily reflect actual guilt of a crime which you may be considering.
 

 This instruction correctly cautioned the jury that it was up to them to determine whether the evidence proved flight and the significance, if any, to be accorded such a determination; it also properly explained the potential weaknesses in the
 
 Myers
 
 chain of inferences described earlier.
 
 See Clark, supra; Register, supra.
 
 We find no error in the instruction.
 

 III.
 

 Several character witnesses testified at trial as to Borders’ good reputation and character. This evidence was, according to appellant, the “essence” of his defense. At the conclusion of the trial, the court instructed the jury in part as follows:
 

 Now, the Defendant in this case has called character witnesses in this case who have testified as to Mr. Borders’ good reputation for honesty, integrity, probity and morality and also have given their personal opinions as to his good character. You should understand that, of course, a good reputation is not a defense to a criminal charge. Nevertheless, the law allows such evidence of character, and you should consider it along with all the other evidence in this case since evidence of a defendant’s good character may give rise to a reasonable doubt that such a person would commit a crime with which he is charged. But if on all the evidence you are satisfied beyond a reasonable doubt that the Defendant is guilty, a showing that he has previously enjoyed a reputation of good character will not justify or excuse the offense, and you should not acquit the Defendant merely because you believe he may have been a person of good repute. In this connection, I further charge you that the testimony of a character witness is not to be regarded by you as expressing that witness’ opinion as to the guilt or innocence of the Defendant of the offense with which he is charged. The guilt or innocence of Mr. Borders in this case is for you the jury and for you alone to determine from all the evidence in this case.
 

 Appellant alleges two errors in this instruction: first, the inclusion of the phrase “a showing that he has previously enjoyed a reputation of good character will not justify or excuse the offense,” and second, an asserted failure to state that character or reputation evidence should be considered along with all of the other evidence in the case.
 
 [25]
 
 We review these alleged errors with the understanding that “so long as the
 
 *1329
 
 charge accurately reflects the law and the facts, the district judge is vested with broad discretion in formulating his charge.”
 
 United States v. Ruppel,
 
 666 F.2d 261, 273-74 (Former Fifth Cir. Unit A),
 
 cert. denied,
 
 - U.S. -, 102 S.Ct. 3487, 73 L.Ed.2d 1369 (1982).
 

 The general rule as to character or reputation evidence was established in
 
 Edgington v. United States,
 
 164 U.S. 361, 17 S.Ct. 72, 41 L.Ed. 467 (1896), in which the Supreme Court announced that a jury instruction must clearly indicate that the jury should consider such evidence in the same manner as it considers all other evidence. Relying in part on
 
 Edgington,
 
 the Fifth Circuit in
 
 United States v. Leigh,
 
 513 F.2d 784 (5th Cir.1975), overturned a conviction because an otherwise satisfactory instruction on reputation evidence concluded with the statement that
 

 evidence of good reputation should not constitute an excuse to acquit the defendant if you, the jury, after weighing all of the evidence in the case, is convinced beyond a reasonable doubt that the defendant is guilty of the offenses charged in the indictment.
 

 Focusing on the phrase “after weighing all of the evidence in the case,” the court concluded that the instruction had improperly conveyed the impression that reputation evidence was to be considered only if the case was otherwise .close. The impact of the error was exacerbated, the court stated, by the fact that the defective statement appeared at the end of the instruction. The
 
 Leigh
 
 court was also “troubled” by the use of the word “excuse,” which impermissibly suggested “that if the jurors let the defendant go free on the basis of such evidence, they would be ‘excusing’ his commission of the crime rather than acquitting him of it.”
 
 Id.
 
 at 786.
 

 Since
 
 Leigh
 
 the Fifth Circuit has further refined its analysis of character and reputation instructions. In
 
 United States v. Furr,
 
 528 F.2d 578 (5th Cir.1976), we approved an instruction on reputation evidence that contained the following statement:
 

 However, evidence of good reputation should not constitute an excuse to acquit a defendant if you, after weighing all of the evidence,
 
 including evidence■ of good character,
 
 are convinced beyond a reasonable doubt that the defendant is guilty of the crime charged in the indictment.
 

 Shortly afterwards, another panel of the Fifth Circuit in
 
 United States v. Lange,
 
 528 F.2d 1280, 1287 n. 12 (5th Cir.1976), upheld an instruction on character evidence that contained an almost identical statement. Yet except for the portion in italics, these instructions were in relevant part the same as the instruction in
 
 Leigh.
 
 But according to the
 
 Lange
 
 and
 
 Furr
 
 panels, adding the phrase “including evidence of good character” cured the evil of the
 
 Leigh
 
 instruction by putting the juries on notice that character evidence should be treated the same as other evidence. As we later stated in
 
 United States
 
 v.
 
 Callahan,
 
 588 F.2d 1078, 1085 (5th Cir.),
 
 cert. denied,
 
 444 U.S. 826, 100 S.Ct. 49, 62 L.Ed.2d 33 (1979),
 
 “Furr
 
 and
 
 *1330
 

 Lange
 
 present independent interpretations of
 
 Leigh
 
 that endorse the distinction between telling the jury to consider character evidence after considering the other evidence and telling the jury to consider character evidence together with all the other evidence.” Both courts also suggested that the use of the word “excuse” was troubling, but they held that its inclusion was not reversible error.
 
 [27]
 

 The jury instruction as to the character evidence in the present case properly follows the distinction established in
 
 Lange
 
 and
 
 Furr
 
 and described in
 
 Callahan.
 
 The trial court instructed that “the law allows such evidence of character, and you should consider it
 
 along with all the other evidence in this case
 
 since evidence of a defendant’s good character may give rise to a reasonable doubt that such a person would commit a crime with which he is charged.” (emphasis added). This clearly indicated to the jury that the character evidence should be weighed along with, not “after,” the other evidence in the case. And as in
 
 Lange
 
 and
 
 Furr, we
 
 decline to hold upon consideration of the charge in its entirety that the mere presence of the word “excuse” negates the clear meaning conveyed by the character instruction as a whole. As we said in
 
 United States v. Ruppel, supra,
 
 666 F.2d at 273, “[tjhere is, of course, no ritualistic incantation or magic formula that the judge must recite in his charge on character evidence.” So long as the jury was not given the impression that character evidence should be treated differently than the other evidence, the instruction clearly was not an abuse of the trial court’s broad discretion.
 
 Id.
 
 at 273-74.
 

 AFFIRMED.
 

 [1]
 

 . Judge Hastings has been a district judge in the Southern District of Florida since 1979.
 

 [2]
 

 .Specifically, Count One charged Borders and Hastings with,
 
 inter alia,
 
 conspiracy to corruptly solicit and accept money “in return for defendant Alcee L. Hastings being influenced in his performance of official acts as a United States District Judge,” and to defraud the United States in connection with the performance of lawful government functions, in violation of 18 U.S.C.A. § 371. Count Two charged that Borders and Hastings “did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due administration of justice” and aided and abetted each other, in violation of 18 U.S.C.A. §§ 2 and 1503. Count Three charged that Borders travelled from the District of Columbia to Florida on or about September 11 and 12, 1981, with intent to commit bribery, in violation of 18 U.S.C.A. § 1952; Count Four charged the same facts on or about September 18 and 19, 1981.
 

 [3]
 

 . On February 1, 1982, Hastings moved to quash his indictment on the ground that the federal district court does not have jurisdiction to try an active federal judge until he is removed from office through the impeachment process. The trial court denied the motion on February 17, 1982, and this Court affirmed.
 
 United States v. Hastings,
 
 681 F.2d 706 (11th Cir.1982), cert. denied, - U.S. -, 103 S.Ct. 1188, - L.Ed.2d - (1983).
 

 [4]
 

 . Borders, a Washington, D.C. attorney, never appeared as counsel of record in any of the Romano proceedings.
 

 [5]
 

 . The calls occurred at 4:40 p.m. and 5:34 p.m. Hastings in turn left two telephone messages that day with Borders. The first, taken at 9:35 a.m., read “Not coming to D.C. today. Call him between 4:30 and 5:00 today. Will be in his office for call.” The second, at 5:10 p.m., was “He’ll be waiting for call. Have him get off the bench. He’ll also let them know if you called. Get him to phone.”
 

 [6]
 

 . Rico wore a concealed body recorder to each meeting with Borders.
 

 [7]
 

 . The conversation as to the proposed dinner was as follows:
 

 RICO: ... I think you had made the suggestion that, ah, we name a place ...
 

 BORDERS: Okay. No sweat.
 

 RICO: ... and a time ...
 

 BORDERS: Okay.
 

 RICO: ... and that, ah, the jud, your ah ...
 

 BORDERS: That somebody would have dinner there.
 

 RICO: Yea.
 

 BORDERS: Okay.
 

 RICO: And he could order, ah, you know, something, we would know (unintelligible).
 

 BORDERS: Okay.
 

 RICO: In other words ...
 

 BORDERS: Okay.
 

 RICO: ... what happened. The only thing is, now, how do I know, how am I gonna get to, ah, know, ah, ah, you know, when he’s available for it, ah, do you want to call me and tell me when?
 

 BORDERS: No, we can set that up now.
 

 RICO: Okay, okay.
 

 BORDERS: You name a place now. Wednesday of next week for dinner.
 

 [8]
 

 . Borders explained the procedure as follows:
 

 RICO: ... before we go any further, ah, ah, the last time we, we talked, my understanding was that the, ah, some property was going to be released.
 

 BORDERS: Within ten days.
 

 RICO: Within ten days of the last time we talked, right?
 

 BORDERS: No, within ten days from today.
 

 RICO: Oh, today?
 

 BORDERS: Yea. We’re not talkin’ about that many different days.
 

 RICO: Oh.
 

 BORDERS: (Laughs)
 

 RICO: Yea, right, right, right. Okay, then, ah ...
 

 BORDERS: Once you do that then file a motion for mitigation of sentence, but don’t do that until that happens.
 

 RICO: Right, right, right, right, right. In a, as a matter of fact, ah, the, ah, I’m not havin’ any, ah, discussions with my, ah, attorney over any of this, ah, bullshit, except the, ah, except the, to tell him, ah ...
 

 BORDERS: Just tell him you’re tired of the appeal, just see if the man will reduce your sentences.
 

 RICO: I see.
 

 BORDERS: And that’ll take ya.
 

 RICO: Okay.
 

 BORDERS: Um hum.
 

 RICO: Okay.
 

 BORDERS: And don’t talk about it to nobody, about you.
 

 [9]
 

 . There was some disagreement as to the method of payment:
 

 RICO: Um, ah, there’s a, um, ah, there’s twenty-five, ah, right there and that’s going to be, ah, my indication that, ah, everything is fíne, and, ah, I feel that when the, when the next transaction takes place in ten days, I’ll come up with another twenty-five and then the remaining hundred on the, ah, on the culmination.
 

 BORDERS: That’s different than what we had said.
 

 RICO: What we had said is, ah, is I give you, ah, up front money for, ah, this thing here, you know, it ...
 

 BORDERS: Well?
 

 RICO: That’s my understanding, what is, what is, what do you ...
 

 BORDERS: My understanding was, I thought you would put up some big escrow.
 

 BORDERS: Ah, well, okay, do it this way. Ah, see, the problem is, I don’t want to keep coming back and forth, down.
 

 RICO: No, I can understand that, you know.
 

 BORDERS: Secondly.
 

 RICO: You want me to go someplace else, you know?
 

 BORDERS: No, no.
 

 RICO: This, this is very important to me.
 

 BORDERS: Yea, well, I can understand your position at this point.
 

 RICO: Alright.
 

 BORDERS: What about as soon as the other is done. Get it all up, then, as soon as he (unintelligible).
 

 RICO: Alright, alright, alright. I think that, that, ah, um, alright, that’s, okay, so the, ah, the balance, okay, now, ah, do you have any idea on the, on the timing so that you figure out, ah, when you want this thing to happen, ah, because, ah, and how do you, and how do you want this, that’s all in hundreds.
 

 BORDERS: That’s fine.
 

 [10]
 

 . The relevant portion of this opinion was not printed in the federal reporter, however, because the Fifth Circuit agreed to rehear the case en banc. On August 2, 1982 — well after the Romano forfeiture proceedings had run their course — the en banc Court vacated the portion of the panel decision that reversed the trial court’s forfeiture order, and affirmed the order as entered.
 
 United States v. Martino,
 
 681 F.2d 952 (5th Cir.) (en banc).
 

 [11]
 

 . At trial, the Justice Department attorney read from the July 8 hearing transcript as follows:
 

 The Court: All right, I am prepared at this time to deny your motion, Mr. Sonnett, and I will give a brief written order with reference to the request. I will allow the forfeitures as previously set out by the Court to be maintained and, as indicated, a brief order will be prepared that will recite the reasoning of the Court, at least insofar as the new matters that have arisen, more specifically, the cases cited by counsel up to this time.
 

 [12]
 

 .In fact, the order went out in the evening of the 6th; obviously Borders was relying on his October 5 conversation with Hastings.
 

 [13]
 

 . According to the testimony of Judge Hastings’ secretary, Hastings’ decision to travel to Washington was made at the last minute.
 

 [14]
 

 . Rico had arrived in Washington the night before. The FBI had secured a room at the Marriott and had installed video equipment in it for the purpose of recording the meeting between Borders and Rico.
 

 [15]
 

 . The evidence did not reflect that Hastings asked Pride any questions about the details of the alleged bribery “in [his] courtroom.”
 

 [16]
 

 . In addition, Pride suggested to Hastings that he go to Florida to obtain the services of a lawyer named Mavrides, who was a friend of Hastings. Although Hastings followed Pride’s advice and returned to Florida, there is no evidence in the record to suggest that Hastings attempted to contact Mavrides before submitting to an FBI interview that occurred when he arrived in Florida later that night.
 

 [17]
 

 .The trial court excluded testimony by Pride that Hastings had also said Pride should not become involved because Pride, who had been convicted of a felony and was disbarred, was “on parole.”
 

 17a
 

 . The Eleventh Circuit has adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, as its governing body of precedent, which is binding unless overruled or modified by this Court en banc.
 
 Bonner v. City of Prichard,
 
 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).
 

 [18]
 

 . Although Borders’ arrest effectively terminated the conspiracy, see
 
 United States v. Flecha,
 
 539 F.2d 874, 876 (2d Cir.1976), post-conspiracy acts of a co-conspirator are admissible.
 
 Lutwak v. United States,
 
 344 U.S. 604, 617-18, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953) (distinguishing post-conspiracy declarations from post-conspiracy acts).
 
 See also United States v. Hackett,
 
 638 F.2d 1179, 1186-87 (9th Cir.1980) (false exculpatory statements by co-conspirator not hearsay because not admitted for their truth, but rather only to show “consciousness of guilt”),
 
 cert. denied,
 
 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Accordingly, we have on prior occasions upheld the admission of evidence of flight on the issue of the existence of a co-conspirator.
 
 E.g., United States v. McLaughlin,
 
 578 F.2d 1180, 1184 (5th Cir.1978).
 

 [19]
 

 . The principal objection to the evidence was that it was insufficient to support a jury instruction on flight, but for the same reason we concluded that “[t]he prejudicial effect of [the flight evidence] so far outweighs its probative value that it should not be admitted on retrial. See Fed.R.Evid. 403.” 550 F.2d at 1050 n. 20.
 

 [20]
 

 . It is not clear whether the Fourth Circuit would have reversed on this ground alone. The court held that the trial court had committed reversible error in admitting evidence of the defendant’s prior convictions, and added the section on flight evidence at the end of its opinion “only because of the likelihood that it will arise again on retrial.” 664 F.2d at 419.
 

 [21]
 

 . Because the
 
 Beahm
 
 court had already held that Beahm was unaware that he was .the subject of a criminal investigation, the time between flight and the commencement of the investigation was not relevant.
 

 [22]
 

 .The Seventh Circuit, -relying on this statement, suggested that “the importance of the immediacy factor would be greatly diminished, if not rendered irrelevant, when there is evidence that the defendant knows that he is accused of and sought for the commission of the crime charged.”
 
 United States
 
 v.
 
 Jackson, supra,
 
 572 F.2d at 641.
 
 Accord, United States v. Hernandez-Miranda,
 
 601 F.2d 1104, 1106-07 (9th Cir.1979).
 
 Cf. Shorter v. United States,
 
 412 F.2d 428, 430 (9th Cir.) (not necessary to prove defendant was aware that he was being sought for crime to make evidence of flight three weeks after crime admissible),
 
 cert. denied,
 
 396 U.S. 970, 90 S.Ct. 454, 24 L.Ed.2d 436 (1969).
 

 [23]
 

 . Neither the fact that Hastings was not legally compelled to talk to the FBI in Washington nor the fact that he eventually talked to them later in the day in Florida alters our conclusion. We view as important only Hastings’ “instinctive or impulsive ... behavior” upon hearing about Borders’ arrest. See
 
 United States v. Myers, supra.
 

 [24]
 

 . In light of the fact that Hastings fled immediately
 
 and
 
 with an awareness that he was the focus of a criminal investigation, we need not address the Seventh Circuit’s suggestion that the existence of the second fact alone may be sufficient to support the admission of flight evidence.
 
 See
 
 note 22
 
 supra.
 

 [25]
 

 . Appellant does not indicate to this Court, however, the degree of prejudicial effect, if any, of the alleged errors and ignores the district court’s suggestion that if there was error, it
 
 *1329
 
 was harmless. The district court reasoned as follows:
 

 In any event, the Court is convinced that any error in the character instruction was harmless and could not in any way have prejudiced the defendant. Not only was the evidence of defendant’s guilt overwhelming, but the testimony as to Borders’ good character was inconsistent with his defense. In closing argument, defendant’s counsel focused on asserted weaknesses in the government’s proof that Hastings was aware of Borders’ activities, and expressly suggested to the jury that Borders was playing a “scam” on the Romanos, that Hastings was not involved in the scam, and that therefore no conspiracy to commit bribery had been proved. Trial Transcript 1109-10. To accept this argument the jury would have had to disbelieve the character evidence. Under these circumstances, and considering the weight of the uncontradicted evidence offered by the government at trial, it is inconceivable that a different instruction on Borders’ character evidence would have resulted in an acquittal in this case.
 

 Because we hold that there was no error in the instruction, we need not address the correctness of the district court’s reasoning.
 

 [27]
 

 . Shortly after these cases were decided, another panel of the Fifth Circuit in
 
 United States v. Harris,
 
 533 F.2d 306 (5th Cir.1976) reversed a conviction in which an instruction identical to that in
 
 Lange
 
 and
 
 Furr
 
 was used. The
 
 Harris
 
 opinion, however, contained no discussion or analysis, did not mention
 
 Lange
 
 or
 
 Furr,
 
 and cited only to
 
 Leigh.
 
 In
 
 United States v. Callahan, supra,
 
 the court attempted to reconcile
 
 Lange, Furr,
 
 and
 
 Harris
 
 and ended up following the first two and disapproving
 
 Harris.
 
 See 588 F.2d at 1085-86.