[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 19-12702; 19-12907
Non-Argument Calendar

_____

D.C. Docket No. 1:18-cr-20698-CMA-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUZ HERNANDEZ,
a.k.a. Lucy Hernandez,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(October 23, 2020)

Before WILLIAM PRYOR, Chief Judge, MARTIN and BRANCH, Circuit Judges.

PER CURIAM:

Luz Hernandez appeals her convictions and sentence for conspiring to commit bank and wire fraud, 18 U.S.C. § 1349, two counts of bank fraud and one count of wire fraud arising from two loans fraudulently obtained for one property in Miami Beach, Florida, *id.* §§ 1343, 1344, and two counts of bank fraud and of wire fraud arising from two loans fraudulently obtained for two properties in Miami, *id.* Hernandez argues that the district court erred by instructing the jury on disguised handwriting as consciousness of guilt, that insufficient evidence supports her convictions for the frauds involving the two properties in Miami, and that her order of restitution is invalid. We affirm.

Three standards of review govern this appeal. Because Hernandez challenges the jury instruction on a ground not raised in the district court, we review that issue for plain error. *United States v. Wright*, 392 F.3d 1269, 1277 (11th Cir. 2004). Because Hernandez presented evidence "after denial of [her] motion for judgment of acquittal and then fail[ed] to renew [that] motion . . . at the end of all of the evidence," we will reverse her convictions for bank fraud and for wire fraud arising from the fraudulent loans for the Miami properties only to prevent a "manifest miscarriage of justice."  *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012) (internal quotation marks omitted). And we review *de novo* the legality of Hernandez's order of restitution. *United States v. Valladares*, 544 F.3d 1257, 1269 (11th Cir. 2008).

The district court did not err, much less plainly err, by instructing the jury to determine whether Hernandez disguised her handwriting and whether her conduct was probative of consciousness of guilt. The act of a "defendant to attempt[] to avoid providing a valid handwriting sample by intentionally distorting [her] handwriting" can "impl[y] a consciousness of guilt," *United States v. Stembridge*, 477 F.2d 874, 876 (5th Cir. 1973), like flight and resisting arrest, *United States v. Borders*, 693 F.2d 1318, 1325 (11th Cir. 1982) (flight); *United States v. Wright*, 392 F.3d 1269, 1278–79 (11th Cir. 2004) (resisting arrest). The district court reasonably decided to give a jury instruction on distorted handwriting because the evidence concerning Hernandez's conduct was "logically and legally relevant to show consciousness of guilt." *Id.* at 1278. Hernandez's behavior was probative to her guilt or innocence because it supported a chain of four inferences: (1) from her behavior to the deliberate distortion of her handwriting; (2) from the distortion to consciousness of guilt; (3) from consciousness of guilt to the crimes charged; and (4) from consciousness of guilt of the crimes charged to actual guilt of the crimes charged. *See Wright*, 392 F.3d at 1278 (applying four-step process to evidence of resisting arrest); *Borders*, 693 F.3d at 1325–26 (applying process to evidence of flight).

Testimony from Agent Detective Patrick McDonough of the Federal Bureau of Investigation and Linda Eisenhart, a forensic document examiner, the

3

documents used to obtain the four fraudulent loans, and Hernandez's exemplars provided "sturd[y] support" for the jury to find that she distorted her handwriting to avoid conviction for the crimes charged in her indictment. *See Wright*, 392 F.3d at 1278. The jury could infer that Hernandez disguised her handwriting from McDonough's account that she wrote slowly while gripping her pen with her three middle fingers and from Eisenhart's opinion that the heavy and even pen pressure, significant tremor, angularity in rounded letters, and blunt beginning and ending strokes on every template were consistent with handwriting distortion. The jury could also find that Hernandez distorted her handwriting based on the dissimilar scripts in her exemplars and in samples of her genuine handwriting. And the jury could infer that Hernandez disguised her handwriting on documents that she knew implicated her in the crimes charged against her. When McDonough gave Hernandez copies of 18 documents used in the four fraudulent loan transactions that had typewritten words in the place of handwriting and instructed her to write the typewritten words on templates of the documents, she distorted her handwriting on every template. The documents included a check Hernandez allegedly wrote to the mortgage broker and a certification of income that she notarized that were used to obtain the two loans on the Miami Beach property; an identification verification for Michael Angel Mayenberg that Hernandez signed as notary public using the false name Cathy Walker and submitted to obtain the loan for 12580 Southwest

76th Street in Miami; and a compliance agreement for Armando Moya Castro that Hernandez signed using the false name Roberta Prida and submitted to obtain the loan for 5600 Southwest 74 Court in Miami.

Hernandez argues that the distortion of her handwriting could stem from consciousness of guilt for any of the fraudulent transactions, but that fact did not prevent the issue from being submitted to the jury. Because Hernandez's behavior supported the admission of evidence of distorted handwriting and was "sufficient[] [to] establish [her] consciousness of guilt" for every fraudulent loan transaction, *see Wright*, 392 F.3d at 1278–79, the responsibility rested with the jury to determine whether Hernandez's guilt corresponded to one or more of the transactions, *see id.* at 1279. And the district court made that plain in its instructions that the jury had to "determine [the] significance and qualitative value, if any," of the handwriting evidence. *See Borders*, 693 F.3d at 1327. The district court instructed the jury that it "may, but . . . need not, infer that [Hernandez] believed that she was guilty," that it "may not, however, infer on the basis of this alone, that [she] is, in fact, guilty of the crimes for which she is charged," and that the issues of "[w]hether or not evidence that [Hernandez] disguised her handwriting shows that [she] believed that she was guilty and the significance, if any, to be given to such evidence, are matters for . . . [it] to decide."

5

Substantial evidence supports Hernandez's convictions for the frauds involving the two properties in Miami. Those mortgage scams bore the same hallmarks as those Hernandez, a licensed title agent, used to aid Javier Coballes to fraudulently obtain the two loans for the property in Miami Beach. For those loans, Hernandez concocted a sham title company whose name mimicked a real title company, contacted the loan broker on behalf of the sham company, posed as its title agent using the name Cathy Walker, and used that false name to create an email address and to prepare and submit false closing documents, including a fraudulent warranty deed that bore a notary stamp she had altered using Adobe Photoshop. The process used to obtain loans for the properties at 76th Street and at 74 Court in Miami was virtually identical. The fraudsters, who included Coballes, prepared and submitted false closing documents using a sham title company, America's Title & Escrow Corporation, and a fake title agent, Roberta Prida, whose names were strikingly similar to Hernandez's former employer of two years, America's Title Corporation, and her fellow closing agent, Roberto Prida. The sham title company used the real company's former business address, its HUD settlement statement, which changed after Hernandez left, and a "funky-looking R" that all its closing agents used as their signature. Records of Hernandez's bank account at Wells Fargo reflected that she made cash deposits of $34,100 in 2015 and of $57,710 in 2016, which corresponded with the laundering and disbursement

of the proceeds of the four fraudulent loan transactions and she did not report as taxable income. And when presented with the falsified documents, Hernandez "attempt[ed] to avoid providing a valid handwriting sample by intentionally distorting [her] handwriting," which the jury treated as evidence of "a consciousness of guilt." *See Stembridge*, 477 F.2d at 876. Although Hernandez presented some testimony that she was disgruntled with Coballes and that his cohorts might have acquired some information about her former employer and coworker by other means, none of the evidence concerning her involvement in the mortgage scams for the two Miami properties "is so tenuous that [Hernandez's] conviction[s] [are] shocking." *See House*, 684 F.3d at 1196 (quoting *United States v. Milkintas*, 470 F.3d 1339, 1343 (11th Cir.2006)).

Hernandez argues that the order of restitution is invalid because she was denied the assistance of counsel, but the record refutes her argument. *See United States v. Roy*, 855 F.3d 1133, 1144 (11th Cir. 2017) (en banc) (discussing *United States v. Cronic*, 466 U.S. 648 (1984)). During sentencing, Hernandez's attorney, Juan De Jesus Gonzalez, agreed to meet with the government about dividing up the amount of restitution, and two weeks later, the government filed an "Agreed-Upon Motion" that stated it had "conferred with . . . Gonzalez, as counsel of record for the defendant," and they were "in agreement" for the district court to enter an order of restitution that awarded specific amounts of restitution to six defrauded lenders.

7

That Gonzalez, in the interim, moved to withdraw from representing Hernandez does not make the statements in the joint motion outside the scope of his representation. To the contrary, Gonzalez's motion states that Hernandez retained him "for trial purposes only," that he represented Hernandez throughout her trial proceedings, including sentencing, and that he sought "to withdraw as attorney o[f] record for purposes of appeal" and for the district court to "appoint CJA appellate counsel."

Hernandez argues that "[t]he district court erred when it ordered her to pay $4.7 million in restitution," but she invited any error in the calculation of the amount of restitution. "[W]here a party invites the trial court to commit error, he cannot later cry foul on appeal," *United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009), and Hernandez remained silent when the government stated at sentencing that the parties agreed as to the amount of restitution and had only to resolve how to divide the amount. Hernandez is bound by her agreement to pay $4,719,711.56 in restitution.

Hernandez also argues that the order of restitution in the amended judgment is defective for two reasons, but her arguments fail. First, Hernandez argues that she was entitled to a 14-day period to respond to the motion filed by the government and to a hearing on the matter. But the motion stated plainly that Gonzalez, on Hernandez's behalf, agreed to the order of restitution, which

8

eliminated the need for a response or for a hearing. *See United States v. Remillong*, 55 F.3d 572, 576 (11th Cir. 1995) ("We have determined that district courts are not required to make factual findings whenever they impose a restitution order if the appellate record provides sufficient reasons for the decision to order full restitution."). Second, Hernandez argues that the amended judgment requires the probation officer to identify the payees and could "expose [her] to greater financial obligations," but the judgment imposes restitution in the same amount requested in the agreed-upon order, which eliminates any confusion or uncertainty as to the identities of the victims for whom restitution is being collected or the amount to which each victim is entitled.

We **AFFIRM** Hernandez's convictions and sentence.