[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 15, 2006
THOMAS K. KAHN
CLERK

_____

No. 05-12742

_____

D. C. Docket No. 04-00067-CR-04-4

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LABOYCE KENNARD,
ABRAHAM L. KENNARD,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(December 15, 2006)**

Before CARNES, MARCUS and KRAVITCH, Circuit Judges.

CARNES, Circuit Judge:

This case grows out of the intersection of two truths.   One, articulated by the Apostle Paul, is that  "the love of money is the root of all evil," 1 Timothy 6:10 (KJV), and the other, often attributed to P.T. Barnum, is that "[t]here's a sucker born every minute," see A.H. Saxon, P.T. Barnum: The Legend and the Man 1 (1989).   Fraudulent investment schemes are likely as old as the truths reflected in those observations, but the one involved in this case has a twist.  A man of the cloth defrauded more than a thousand churches and other non-profit organizations out of millions of dollars by promising them miraculous returns on their investments.  The law of economic reality dictates that all promises of wildly extravagant investment returns will be broken, and legal realities mandate that litigation must follow.

I.

With the help of his brother Laboyce, Rev. Abraham Kennard bilked hundreds of churches and other non-profit organizations out of millions of dollars. A jury convicted him of nine counts of mail fraud in violation of 18 U.S.C. § 1341, seventy-seven counts of conducting a monetary transaction involving over $10,000 in criminally-derived property in violation of 18 U.S.C. § 1957, twenty-seven counts of engaging in monetary transactions to promote criminal activity in violation of 18 U.S.C. § 1956(a)(1)(A)(i), one count of conspiring to launder

2

money in violation of 18 U.S.C. § 1956(h), and one count of income tax evasion in violation of 26 U.S.C. § 7201. The same jury found Laboyce Kennard guilty of one count of conspiring to launder money in violation of 18 U.S.C. § 1956(h). The two Kennard brothers now appeal their convictions, and Laboyce challenges the calculation of his 38-month prison sentence. (For the sake of simplicity and to avoid needless repetition, we will distinguish between the Kennard brothers by using their first names without repeating their last one.)

Abraham ran his scheme using a corporation he set up named Network International Investment Corp. Targeting churches and other nonprofit organizations seeking funds for capital improvement projects, Abraham made his victims a simple offer. In exchange for every $3,000 in "membership fees" that the organizations paid into the Network corporation, they would receive $500,000 in grants. Abraham told prospective Network members that the grants were possible because he had lined up "investors"—including Evander Holyfield's brother, Bernard—who would provide tens of millions of dollars. Moreover, Abraham and Network had plans to build a number of profit-generating Christian resorts around the country. These, too, would help him fund the grants.

Unfortunately for his victims, they believed Abraham's plan and accepted his offer. All told, Network raised more than $8.7 million from more than 1,600 churches and other nonprofits around the United States.

As Network "membership fees" poured in, Abraham deposited them in the escrow account of his attorney, Scott Cunningham. From there, Abraham could send the funds to any number of destinations. One place they went was into a bank account of Promotional Time International, Inc., a company which Laboyce controlled. Laboyce deposited into that account checks from both Cunningham's escrow account and from Abraham himself. From that account, Laboyce later wrote checks to Abraham.

Abraham fled after learning of his initial indictment in January 2004, leading authorities on a five-week manhunt before being captured in Okolona, Mississippi. By the time of trial a year later, the government had reached plea agreements with several other players in the scheme, and attorney Cunningham—who was eventually convicted for his role in all of this—was granted a separate trial. After a four-week trial, a jury found both Kennard brothers guilty of all of the counts remaining against them after the government had dismissed several mail fraud counts against Abraham. Abraham and Laboyce were sentenced to 210 months and 38 months, respectively.

On appeal, the brothers raise a total of seven issues. We consider first the only issue relating to Abraham alone. We then consider an issue the brothers raise jointly before concluding with consideration of the five issues relating to Laboyce alone.

## II.

Abraham contends that the district court erred by admitting evidence of—and instructing the jury on—his post-indictment flight. We review a district court's evidentiary rulings only for an abuse of discretion. United States v. Word, 129 F.3d 1209, 1212 (11th Cir. 1997). District courts also "have broad discretion in formulating jury instructions provided that the charge as a whole accurately reflects the law and the facts." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (quotation omitted).

The jury could have inferred from the evidence that Abraham learned of his indictment the day it was issued and he began evading authorities on that day and continued to do so until he was arrested five weeks later. During that period, Abraham used only pre-paid phone cards and payphones instead of the cell phone he owned. He used a rental car that someone else had rented. He took evasive measures such as parking several blocks away from a given destination. And he never attempted to contact the FBI agent with whom he had been speaking about

5

Network's activities before the indictment and who had called Abraham's mother attempting to locate him. See United States v. Blakely, 960 F.2d 996, 1000–01 (11th Cir. 1992) (noting that the probative value of evidence of a defendant's flight stems from (1) the similarity among the crimes with which the defendant is charged and (2) the timing of the supposed flight). Furthermore, as Abraham admits, the evidence of his fraud was "tremendous."

In this case, as in United States v. Borders, 693 F.2d 1318 (11th Cir. 1982), the district court "correctly cautioned the jury that it was up to them to determine whether the evidence proved flight and the significance, if any, to be accorded such a determination." Id. at 1328. The fact that Abraham presented jurors with his own explanation of the post-indictment events in no way alters the propriety of that instruction. It was a jury issue.

Abraham argues that the court should not have admitted evidence of flight because it was more prejudicial than probative. As for the evidence being prejudicial, the idea seems to be that it was truly prejudicial because it made Abraham look so guilty. Of course it did. People, including jurors, realize that while "[t]he wicked flee when no man pursueth," Proverbs 28:1 (KJV), they really flee when law enforcement is looking for them. That is why evidence of flight is admissible and probative. Probative force is not the same as legal prejudice. If it

6

were, the stronger the evidence of flight the less admissible it would be. Abraham's argument amounts to a general attack on any use of flight evidence and is inconsistent with our decisions on the issue, such as those we issued in the Blakely and Borders cases. The district court did not abuse its discretion in admitting the evidence of flight, and there was no error in the instruction the court gave on the subject.

III.

Abraham and Laboyce both contend that the district court erred in excluding the deposition testimony of Abraham's attorney, Cunningham, which, they say, is the only evidence that they lacked the necessary criminal intent to commit the money laundering crimes for which they were convicted. The Securities and Exchange Commission took Cunningham's deposition in the fall of 2002 during civil proceedings the Commission had filed against Abraham and Network.

Deposition testimony from a prior civil proceeding is not admissible in a criminal case unless the declarant is unavailable as a witness and the party against whom the testimony is offered in the criminal case "had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination" in the prior civil proceeding. Fed. R. Evid. 804(b)(1). The parties agree that Cunningham was "unavailable" as a witness at the Kennards' criminal trial because

7

of his intention to invoke his Fifth Amendment right to avoid self-incrimination. The question, then, is whether the district court abused its discretion in excluding the deposition after finding that the SEC's motive in deposing Cunningham was dissimilar from that of the United States Attorney in prosecuting the brothers.

The brothers note that the subject of Cunningham's deposition by the SEC overlaps with that of their criminal trial to the extent that the deposition concerns activity involving the escrow account. They also point out that there are occasions during the deposition in which the SEC lawyers "challenged" Cunningham's explanations.

The record is insufficient, however, to permit us to conclude that the district court erred in finding that the Kennards had not established a sufficient similarity of motives—it actually went further and found that there was a dissimilarity of motives. "[T]his inquiry is inherently factual, depending in part on the similarity of the underlying issues and on the context of the questioning." United States v. Miles, 290 F.3d 1341, 1353 (11th Cir. 2002) (per curiam) (citing United States v. Salerno, 505 U.S. 317, 326, 112 S. Ct. 2503, 2509 (1992) (Blackmun, J., concurring)). As proponents of the deposition, it was the brothers who bore the burden of establishing that it came within the former testimony hearsay exception. See United States v. Acosta, 769 F.2d 721, 723 (11th Cir. 1985) (per curiam); cf.

8

United States v. Omar, 104 F.3d 519, 522 (1st Cir. 1997)("[T]he evidence in question being hearsay, it was the defendants' burden to prove each element of the exception they invoked.")

The brothers did not carry their burden. All we know from the record on appeal about the underlying issues or the context of the SEC's deposition is that the SEC lawyers wanted "to ask [Cunningham] some questions in connection with" a civil action the SEC had filed against Network in the Eastern District of Pennsylvania. That is how those lawyers prefaced their deposition questions. From the exchange before the district court regarding the deposition, we can tell only that the SEC was "worried about whether somebody has violated the securities laws" (according to the government's counsel) and that the SEC was seeking a restraining order (according to the district court judge). What we do not know is precisely why the SEC thought it needed information from Cunningham. Neither the deposition transcript, nor the hearing on the deposition's admissibility, nor the parties' briefs (including, significantly, the Kennards') tell us what relief the SEC was seeking, what it had to show to obtain that relief, or under what statutes the SEC was proceeding.

As they did before the district court, the brothers rest their arguments primarily on the tenor of the questions asked of Cunningham in the deposition. On

appeal, they present a laundry list of examples which, they say, show repeated challenges to Cunningham's responses and "a meaningful attempt to discern . . . Cunningham's credibility." Even if we accept this characterization of Cunningham's questioning, we still do not know enough about the SEC's motive. The brothers did not meet their burden of showing that the SEC's motive in questioning Cunningham was similar enough to that of the prosecutors in this criminal case against the Kennard brothers. We cannot say that the district court abused its discretion by failing to admit Cunningham's deposition testimony.

## IV.

We turn now to the five issues Laboyce raises on his own.

## A.

First, Laboyce challenges the sufficiency of the evidence supporting his conviction for conspiracy to commit money laundering. In particular, he contends that the government presented no evidence that would allow a jury to find beyond a reasonable doubt either the existence of a criminal agreement or his knowing participation in it. We review de novo the sufficiency of the evidence. United States v. Harris, 20 F.3d 445, 452 (11th Cir. 1994).

To convict Laboyce on the money laundering conspiracy charge, the government had to prove that some agreement existed to launder the proceeds of

Abraham's church fraud, and that Laboyce knowingly and voluntarily participated in that agreement. See United States v. Silvestri, 409 F.3d 1311, 1328 (11th Cir. 2005). "Conspiracy may be proven by circumstantial evidence and the . . . extent of [the defendant's] knowledge of details in the conspiracy does not matter if the proof shows [he] knew the essential objective of the conspiracy." United States v. Gupta, 463 F.3d 1182, 1194 (11th Cir. 2006) (quotation omitted). Viewing the evidence in the light most favorable to the government, as we must in all sufficiency-of-the-evidence claims, Silvestri, 409 F.3d at 1327, the record amply supports both elements.

The evidence was sufficient to show that Laboyce was a knowing participant in an agreement to launder the proceeds of Abraham's fraud. Laboyce set up the Promotional account and made large deposits consisting of cashier's checks from Abraham and checks drawn on Cunningham's escrow account—the same account Abraham used to deposit Network membership fees. Laboyce also made almost all of the account's withdrawals, which were mostly in cash and included two cashiers checks made payable to Abraham.

Laboyce's substantial involvement in Network events shows his knowing involvement in the scheme to launder the proceeds of the fraud and evidences that he knew the "essential objective of the conspiracy." Gupta, 463 F.3d at 1194. In

11

March 2002, for instance, Laboyce went with Abraham to a Network meeting in Charlotte, North Carolina at which Abraham gave Network members fake, oversized disbursement checks instead of the grant money he had been promised. Two months later, Laboyce videotaped Abraham conducting a sham groundbreaking ceremony for one of the Christian resorts Abraham had promised that Network would build, the plan being to show the video to members in an attempt to forestall their complaints. Laboyce later "worked security" for Abraham at a July Network meeting in Orlando where those in attendance reacted angrily to Abraham's announcement that their grants would again be delayed. And in October, Laboyce attended a meeting at which Abraham informed him that an FBI investigation of Network had led to the seizure of Cunningham's escrow account. All of this evidence is enough for a jury to find beyond a reasonable doubt that Laboyce knowingly participated in the conspiracy to launder the proceeds of the fraud.

Laboyce argues in the alternative that there was a fatal variance between the crime charged in the indictment and the evidence the government presented at trial. The indictment charged that Laboyce conspired to launder the fraud proceeds with Abraham, Cunningham, and two others, including Abraham and Laboyce's half-brother, Alvin Jasper. Laboyce argues, however, that the government's evidence at

12

most suggested his participation in one, smaller-scale conspiracy with Abraham alone. This conspiracy, he argues, was "separate and distinct" from those involving Abraham and any of the other actors named in the indictment. We will not reverse convictions based on a variance unless that variance was both material and substantially prejudicial to the defendant. United States v. Calderon, 127 F.3d 1314, 1327 (11th Cir. 1997).

Laboyce's variance argument is not convincing. As the government points out, Laboyce does not even acknowledge the substantial prejudice requirement, much less try to meet it. Moreover, at trial the government did present enough evidence to prove a larger conspiracy consisting of the five actors named in the indictment. For instance, the government showed that Laboyce received checks from Cunningham to deposit in the Promotional account. And both Laboyce and Jasper were present when Abraham told them of the FBI's investigation and that he needed his money back from them. At one point, Laboyce received $38,000 from Jasper in Houston to deliver to Abraham. The government thus proved what the indictment promised it would. There was no variance.

## B.

Laboyce's next contention is that there was no basis for the district court's deliberate ignorance jury charge because there was no evidence suggesting that he

13

took affirmative steps to avoid learning about the nefarious nature of the Network enterprise. See United States v. Puche, 350 F.3d 1137, 1149 (11th Cir. 2003) ("An instruction on deliberate ignorance is appropriate only if it is shown [among other things] . . . that the defendant purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." (quotation omitted)). For its part, the government points us to several items of evidence it says justifies the deliberate ignorance instruction.

We need not decide whether the evidence justified the deliberate ignorance instruction, because our decision in United States v. Stone, 9 F.3d 934 (11th Cir. 1993), says that it does not matter. In that decision we held that any error in giving an unwarranted deliberate ignorance instruction is harmless if the jury could have convicted on an alternative, sufficiently supported theory of actual knowledge. Id. at 937–40. As we have already discussed, there was enough evidence to convict Laboyce of conspiracy to launder money on the basis of actual knowledge. The jury here, like the jury in Stone, id. at 937–38, was instructed that it could convict Laboyce by finding beyond a reasonable doubt either that he actually knew about the church fraud or that he deliberately closed his eyes to what was obvious in order to avoid learning the criminal nature of the activity. In this case, as in Stone, the jury was instructed in the alternative, and because we assume that juries follow

14

their instructions, id. at 938, any shortcoming in the evidence about deliberate ignorance was rendered harmless by the sufficiency of the evidence of actual knowledge, id. at 940.

## C.

For the first time on appeal, Laboyce also contends that the district court erred in not telling the jury that it could not convict unless it was unanimous in finding the object of the conspiracy. The indictment alleges that Laboyce and the others conspired to violate "Title 18, United States Code, Sections 1956 and 1957" in violation of 18 U.S.C. § 1956(h). Absent an appropriate instruction, Laboyce argues that "the jury would have been permitted to return a guilty verdict even if half thought the defendant conspired to violate § 1956 and half thought he conspired to violate § 1957."

We will not correct an error the defendant failed to raise in the district court unless (1) the district court did, in fact, err, (2) the error was plain, (3) the error affects the defendant's substantial rights, and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005), cert. denied, 545 U.S. 1127, 125 S. Ct. 2935 (2005). The third requirement always puts a defendant to the burden of proving that the alleged error affected the outcome of the trial, which means he

15

must show a reasonable probability of a different result but for the error to which he failed to object. Id. at 1299. The burden of showing that "is anything but easy," id., and Laboyce has not carried it. He has failed to point to anything indicating that the jury would have reached a different verdict if the instruction he did not request had been given.

D.

Next, Laboyce contends that the district court erroneously denied his motion to sever his trial from that of Abraham. To reverse a conviction because of an improper denial of a severance, a defendant must carry the "heavy burden" of demonstrating that he "suffered compelling prejudice" and received an unfair trial. United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quotation omitted). We review a district court's ruling on a severance motion only for abuse of discretion. United States v. Cross, 928 F.2d 1030, 1037 (11th Cir. 1991).

Laboyce points us to three potential sources of prejudice: (1) the egregious nature of the fraud with which his co-defendant Abraham was charged; (2) his fraternal relationship with Abraham; and (3) the fact that Abraham represented himself. What Laboyce does not do is show that he actually suffered the "compelling prejudice" necessary to win reversal of his conviction. As Laboyce acknowledges in his brief, a court's cautionary instructions ordinarily will mitigate

16

the potential "spillover effect" of evidence of a co-defendant's guilt. See United States v. Alvarez, 755 F.2d 830, 857–59 (11th Cir. 1985). There is no suggestion in this case that the jury could not follow the district court's instruction to consider "the case of each defendant . . . separately and individually." We will not reverse based on speculation.

E.

Finally, for the first time on appeal, Laboyce contends that the district court erred in calculating his 38-month prison sentence. He grounds this argument on the Sentencing Guideline for money laundering, U.S.S.G. § 2S1.1(b)(2), which requires the sentencing court to add one or two points to a defendant's base offense level depending on which of two federal money laundering statutes he violated. Since the jury did not expressly rest its conviction of Laboyce on the statute requiring the two-level increase he actually received, he argues he should have gotten the lesser increase.

Even if the court had given Laboyce the one-level increase he says was applicable, the 38-month sentence he received would still fall within the resulting guideline range. That means he has not carried his burden of showing that his "substantial rights" were violated, as required in order for him to be entitled to relief under the plain error rule.

**AFFIRMED.**