[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10297
Non-Argument Calendar
_____

D.C. Docket No. 6:15-cr-00126-CEM-KRS-2


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

SANDRA MILENA NIEVES,
EILEEN SANTOS,

Defendants-Appellants.


_____

Appeals from the United States District Court
for the Middle District of Florida
_____

(November 10, 2016)

Before ED CARNES, Chief Judge, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Eileen Santos and Sandra Nieves were convicted as participants in a counterfeit currency conspiracy. They both challenge their convictions, raising numerous issues regarding the district court's evidentiary rulings, its instructions to the jury, and the sufficiency of the evidence. Nieves also challenges her sentence.

**I.**

A grand jury indicted Santos, Nieves, Ramon Rodriguez, and Carlos Fuentes as participants in a counterfeit currency scheme. Count One charged all four defendants with conspiracy to pass or attempt to pass or possess counterfeit currency. Count Two charged all four with substantively possessing counterfeit currency. Count Three charged Fuentes alone with passing or attempting to pass counterfeit currency. And Count Four charged Nieves alone with passing or attempting to pass counterfeit currency. All of those charges arose under 18 U.S.C. § 472.

Rodriguez and Fuentes reached plea deals with the government, while Santos and Nieves proceeded to trial. At Santos and Nieves' joint trial, Rodriguez testified that he learned about the scheme, which already involved Santos and Nieves, from Fabian Ortiz and his father Jorge Ortiz.[1] He testified that Fabian and Nieves hid counterfeit currency in the lining of suitcases in order to smuggle it into

---

[1] To avoid confusion we will refer to the Ortizes by their first names.

2

this country from Colombia. Then the group would go to various stores and buy low-cost items with counterfeit $100 bills, receiving real money as change for their purchases. In addition to the counterfeit currency, the group would carry authentic $100 bills and withdrawal receipts from legitimate banks. That way, if a group member got caught, he or she could say that it was an innocent mistake and that the bad bill had come from a bank.

Rodriguez testified that at one point he traveled across the East Coast with Santos, Nieves, Fuentes, and Jorge, exchanging counterfeit currency along the way.[2] As they became more experienced, they realized that it was especially easy to pass counterfeit currency at Target stores. Santos even joked that Target "was an easy target."

At trial Santos and Nieves attempted to introduce, for impeachment purposes, evidence of Rodriguez's prior convictions for a slew of crimes including grand theft, possession of cocaine, and possession of a fictitious license. The district court sustained the government's motion to exclude the convictions. The result was that on Rodriguez's cross-examination Nieves and Santos impeached him not with his prior convictions but by having him confirm that he was testifying

---

[2] Rodriguez's fiancée also came along, but she was never charged with passing counterfeit currency.

3

as part of a plea deal and by asking him about discrepancies between his testimony and his initial statements to the police.

The government also called Fuentes as a witness. He stated that he had personally seen Santos and Nieves pass counterfeit currency multiple times on their East Coast trip. When he tried to testify that Jorge had told him that Santos and Nieves had gone to Colombia to collect counterfeit bills, Santos objected. She argued that admitting Jorge's out-of-court statement implicating her would violate Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968), because Jorge was not available for cross-examination.[3] The court overruled that objection and allowed Fuentes to repeat Jorge's statement.

In addition, the government offered circumstantial evidence that Santos and Nieves had passed or possessed counterfeit currency. It presented security camera footage of Santos visiting multiple Target stores within the span of an hour during the East Coast trip. And it offered bank records showing that Nieves visited the same cities as the others during the East Coast trip, and that she had traveled to Colombia.

As evidence of its charge that Nieves individually had passed or attempted to pass counterfeit currency (Count Four), the government called Joseph Aguilera,

---

[3] Fabian and Jorge were unavailable to testify because they had been deported to Colombia.

4

a police officer with the Casselberry (Florida) Police Department. He testified that he had been dispatched to a Casselberry Walmart because Nieves had attempted to pass a counterfeit bill. When he arrived at the Walmart he took a statement from Nieves, who claimed that the bad bill had come from her bank. During his investigation at the Walmart, the Walmart manager gave Aguilera the counterfeit bill, and Aguilera placed and sealed it in a signed evidence bag. During Aguilera's direct examination at trial, the government proffered that bill as evidence, and the court admitted it over Nieves' objection. The government did not call the Walmart cashier who had received the counterfeit bill from Nieves.

Another government witness, Agent Jeffrey Seeger of the United States Secret Service, described his investigation of the counterfeit currency ring. He explained that an undercover buy from Fabian and searches of Fabian's car, motel room, and suitcases resulted in the seizure of over $280,000 in counterfeit currency. He also testified that the serial number on the Casselberry Walmart counterfeit bill matched the serial number of several counterfeit bills seized during those searches.

After the government's case in chief, Santos testified in her own defense. She stated that she had thought the East Coast trip had an innocent purpose and that she didn't know that the others were passing counterfeit bills. Nieves' son and

5

ex-boyfriend also testified; both stated that Nieves was never a member of any counterfeit currency ring.

After both sides rested, the district court instructed the jury that it could find that the defendants "knowingly" possessed and attempted to pass counterfeit currency if the evidence proved beyond a reasonable doubt that the defendants had every reason to know the counterfeit nature of the bills but deliberately shut their eyes to that fact. The court overruled Santos' objection to that "deliberate ignorance" instruction. The jury found Santos and Nieves guilty on all counts.

Nieves' presentence investigation report (PSR) found her responsible for $289,200 in loss — the total amount of counterfeit currency the government had seized from the conspirators during its investigation. It also found that part of Nieves' offense took place outside the United States, triggering a two-level increase to her offense level. See United States Sentencing Guidelines § 2B5.1(b)(5) (Nov. 2015). Nieves objected to both findings. At Nieves' sentence hearing the government called Agent Seeger to support the PSR's recommendations; he testified that Fabian had told him that Nieves had brought back $176,000 in counterfeit currency over the course of two trips to Colombia.

The district court adopted the PSR in full. It calculated Nieves' advisory guidelines range to be 46 to 57 months and sentenced her to 46 months

imprisonment.  Santos, who had been charged with and convicted of one count less than Nieves and whose specific offense characteristics did not include having committed an "offense outside the United States" was sentenced to 7 months imprisonment.

## II.

We first address Santos' contention that there was insufficient evidence for the jury to find her guilty of conspiracy to pass or attempt to pass or possess counterfeit currency (Count One), and possession of counterfeit currency (Count Two).  Santos did not make a renewed motion for a judgment of acquittal at the close of trial, so we review her challenge to the sufficiency of the evidence only for a manifest miscarriage of justice.  United States v. House, 684 F.3d 1173, 1196 (11th Cir. 2012).  That means that we will affirm her conviction unless "the evidence on a key element of the offense is so tenuous" that the conviction is "shocking."  Id.

Santos details the evidence that, in her view, points to her innocence.  But "it is not enough for a defendant to put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt."  United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006), abrogated on other

grounds as recognized in United States v. DiFalco, — F.3d —, No. 15-14763, 2016 WL 5092599 (11th Cir. Sept. 20, 2016).  She fails to address the overwhelming direct and circumstantial evidence that the government presented at trial.  For example, Rodriguez and Fuentes testified about Santos' actual knowledge of, and active participation in, the scheme, including her remark that Target was "an easy target" for passing counterfeit bills.  And security camera footage showed her visiting in a short period of time multiple Target stores that reported receiving counterfeit bills.  In light of that evidence, there is nothing "shocking" about her convictions, and there was no manifest miscarriage of justice.

Santos also contends that the district court erred by allowing Fuentes to testify that Jorge had told him that Santos and Nieves were going to Colombia to bring back counterfeit currency.  Because Jorge was unavailable for cross-examination, Santos asserts that testimony about his out-of-court statements violated Bruton v. United States, 391 U.S. 123, 88 S. Ct. 1620 (1968).  We review "issues concerning a district court's evidentiary rulings, such as the Bruton claim here, for abuse of discretion . . . ."  United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007).

In Bruton the Supreme Court held that the Confrontation Clause of the Sixth Amendment generally bars admitting a codefendant's confession inculpating the

8

defendant unless that codefendant is subject to cross-examination.  391 U.S. at 126, 88 S. Ct. at 1622.  That rule does not apply here for two reasons.

First, Bruton applies only "in the context of a joint trial."  Id. at 137, 88 S. Ct. at 1628; see Dutton v. Evans, 400 U.S. 74, 87, 91 S. Ct. 210, 219 (1970) (distinguishing Bruton on the ground that the defendant was not tried jointly with the confessor).  While Santos was tried jointly with Nieves, she was not tried jointly with Jorge, so Bruton does not apply to the admission of Jorge's out-of-court statements at Santos' trial.

Second, this Court has held that the admission of a co-conspirator's statement made in furtherance of the conspiracy does not violate Bruton.  United Sates v. Ayarza-Garcia, 819 F.2d 1043, 1049 (11th Cir. 1987), superseded by statute on other grounds by 46 U.S.C. app. § 1903(f); see also Dutton, 400 U.S. at 87, 91 S. Ct. at 219 (holding that a Georgia evidence rule allowing admission of co-conspirators' statements did not violate the Confrontation Clause).  Here, Jorge's statement was admitted on the ground that it was not hearsay because it was a co-conspirator's statement made in furtherance of a conspiracy, and Santos does not challenge that ruling.  That means that under our Ayarza-Garcia decision Bruton does not bar admission of the challenged statement.

9

Santos' final contention is that the district court erred by instructing the jury that it could find that she acted "knowingly" if it found that she was "deliberately ignorant."  But "[w]e need not decide whether evidence justified the deliberate ignorance instruction, because our decision in United States v. Stone, 9 F.3d 934 (11th Cir. 1993), says that it does not matter."  United States v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006).  That is because an errant deliberate ignorance instruction is harmless if the jury could have convicted on a sufficiently supported theory of actual knowledge.  Id.

In addition to circumstantial evidence of Santos' actual knowledge of the counterfeit currency scheme, Rodriguez and Fuentes testified about her actual knowledge of the scheme and recounted her statement that it was easy to target Target.  So, even assuming the deliberate ignorance instruction was in error, the error was harmless because the jury had sufficient evidence to find that Santos had actual knowledge.

## III.

Having disposed of all of Santos' contentions, we now turn to Nieves' appeal.

### A.

10

Nieves first contends that there was insufficient foundation to admit into evidence the Casselberry Walmart counterfeit $100 bill and that the bill was not relevant evidence.  We review a district court's evidentiary rulings for abuse of discretion, United States v. Dortch, 696 F.3d 1104, 1110 (11th Cir. 2012), and there was no abuse here.

Under Federal Rule of Evidence 901(a), proffered evidence must be authenticated before admission by "evidence sufficient to support a finding that the item is what the proponent claims it to be."  Importantly, the proponent need only make out a prima facie case that the evidence is what he says it is; after that, the ultimate question of authenticity is left to the jury.  United States v. Belfast, 611 F.3d 783, 819 (11th Cir. 2010).

Nieves argues that the government failed to lay the proper foundation for the Casselberry Walmart bill because it did not put on testimony that the proffered bill was the one that she actually handed to a Walmart cashier.  But that argument ignores all of the circumstantial evidence that linked Nieves to the proffered bill. Aguilera testified that he received the counterfeit bill from the Walmart's manager and that Nieves admitted to having tried to pay with a bill that turned out to be "not good."  He also connected the bill he received that day to the bill offered into evidence by noting that he had placed the counterfeit note in the same evidence

11

bag that was presented at trial. And through their matching serial numbers, Agent Seeger linked the proffered bill to other counterfeit bills that had been seized during the investigation of the conspiracy. That evidence, taken together, established a prima facie case that the bill was what the government claimed it was, and the district court properly admitted it.

Nieves' argument that the bill was not relevant is also based on her assertion that the government's evidence did not directly link the proffered bill to the counterfeit bill she was accused of passing. Under Federal Rule of Evidence 401, evidence is relevant if "it has any tendency to make a fact more probable" than it would be without the evidence and the "fact is of consequence in determining the action." Here, the matching serial numbers on the proffered bill and other bills seized from the conspiracy establish its relevance because they make it more probable that Nieves took part in the counterfeit currency conspiracy. The district court acted within its discretion when it admitted the proffered bill.

## B.

Nieves next challenges the district court's decision to exclude Rodriguez's conviction history; she had intended to use the convictions to impeach him on cross-examination. As an evidentiary ruling, we review that district court ruling

12

for abuse of discretion.  United States v. Pritchard, 973 F.2d 905, 908 (11th Cir. 1992).

Federal Rule of Evidence 609 creates a presumption against admissibility for convictions when the witness was convicted or released more than ten years before he testifies.  Evidence of those convictions is barred unless its probative value "substantially outweighs" its prejudicial effect.  Fed. R. Evid. 609(b)(1).  The upshot is that "such convictions will be admitted very rarely and only in exceptional circumstances."  Pritchard, 973 F.3d at 908 (quotation marks omitted).  And in the exceptional case where the district court does not admit a ten-year-old conviction that should have been admitted, the error is harmless "if the witness' credibility was sufficiently impeached by other evidence . . . ."  United States v. Burston, 159 F.3d 1328, 1336 (11th Cir. 1998).

All of Rodriguez's convictions were over ten years old, and the district court did not abuse its discretion in finding that this was not an exceptional circumstance warranting their admission.[4]  Indeed, the probative value was especially slim here because Nieves was able to impeach Rodriguez's credibility in other ways, including bringing up his plea deal with the prosecution and the discrepancies

---

[4] As stated above, the Rule 609(b) presumption does not apply to convictions where the witness was released within ten years of his testifying, even if his conviction was earlier.  But Nieves has not asserted that Rodriguez was released within the ten year window, and we do not address that possibility.

13

between his initial statements and his testimony. That also means that, even if the district court had erred by excluding the prior convictions, the error would have been harmless because Rodriguez was sufficiently impeached by other evidence.

## C.

Nieves also contends that the district court erred by not granting her renewed motion for a judgment of acquittal after the jury's verdict. We review de novo a district court's post-trial ruling on a renewed motion for a judgment of acquittal, but we make all reasonable inferences in the government's favor. United States v. Edouard, 485 F.3d 1324, 1349 (11th Cir. 2007). Furthermore, all credibility determinations are for the jury to make, and we assume that it made them in a way that supports the verdict. Thompson, 473 F.3d at 1142.

The thrust of Nieves' argument is that Rodriguez's and Fuentes' testimony was not credible because they were co-conspirators who received plea agreements in exchange for their testimony. Without that testimony, she asserts, there was insufficient evidence to prove that she knew the unlawful purpose of the conspiracy and willfully joined it (Count One) or that she willfully possessed counterfeit currency with intent to defraud (Count Two). But because we must assume that the jury found that testimony credible, there was more than enough evidence to support those convictions.

14

Nieves also asserts that the government did not present sufficient evidence regarding her mental state to convict her on Count Four, which charged her with knowingly passing or attempting to pass counterfeit currency.  She argues that there was no evidence that she knew the Casselberry Walmart bill was counterfeit and no evidence that she intended to defraud.  Here again she relies on the fact that the government did not call a witness who directly received the proffered bill from her.  A reasonable jury could infer, however, that Nieves passed that bill because its serial number matched the serial numbers of other counterfeit bills seized during the investigation of the conspiracy.  A reasonable jury could find that Nieves knew that the bill, like all of the bills held by the conspirators, was counterfeit, and that she tried to pass the bill with the intent to defraud.  The evidence also showed that Nieves followed the conspiracy's MO after being caught — offering authentic currency and blaming her bank — which could lead a reasonable jury to find that she had both knowledge and intent.  The evidence, therefore, was sufficient to sustain the verdict.

## D.

Finally, Nieves challenges her sentence on four grounds.  We will address each in turn.  First, Nieves contends that the district court erred by increasing her offense level by two levels because it found that part of the offense occurred

15

outside the United States.  We review that factual finding for clear error, <u>United States v. Williams</u>, 340 F.3d 1231, 1234–35 (11th Cir. 2003), and we hold that it was not clearly erroneous.  Rodriguez testified at trial that Nieves went to Colombia twice to bring back counterfeit currency, and bank records introduced into evidence showed that she was in Colombia when he said she was.  That was enough for the district court to find by a preponderance of the evidence that part of her offense occurred outside the United States.[5]

Nieves also challenges the increase in her offense level on due process grounds.  She points to the out-of-court statement by Fabian, repeated at the sentence hearing by Agent Seeger, that she smuggled $176,000 of counterfeit currency from Colombia into the United States.  While she concedes that hearsay is admissible at sentencing, <u>see</u> <u>United States v. Ghertler</u>, 605 F.3d 1256, 1269 (11th Cir. 2010), Nieves argues that basing her sentence on such "unreliable" evidence violated her right to due process.

We review <u>de</u> <u>novo</u> constitutional challenges to sentences.  <u>Id.</u> at 1268.  Nieves is correct that "[a] defendant has a due process right . . . not to be sentenced based on false or unreliable information."  <u>Id.</u> at 1269.  But the burden is on the

---

[5] Nieves repeatedly asserts that the district court failed to make specific factual findings at sentencing.  That is incorrect.  The court adopted the PSR's factual findings as its own.

defendant to show "(1) that the challenged evidence is materially false or unreliable and (2) that it actually served as the basis for the sentence." Id.

Nieves has not met her burden. She argues that the statement was not reliable because it was hearsay, but she does not account for the evidence at trial that corroborated the statement, including Rodriguez's testimony about her trips to Colombia and Nieves' bank statements showing she was there. That corroboration established the reliability of Fabian's statement. And she can point to nothing in the record that suggests that the court "based" its increase on Fabian's statement, as opposed to on the evidence of Nieves' trips to Colombia presented at trial.

Second, Nieves challenges the district court's loss calculation, which we review for clear error. United States v. Baldwin, 774 F.3d 711, 727 (11th Cir. 2014). She argues that she was only personally responsible for $221,000 of loss, so the district court erred when it attributed over $250,000 in loss to her. The higher loss calculation increased her offense level by 12 instead of 10. But Nieves' personal responsibility is beside the point because at sentencing "[a] defendant may be held responsible for the reasonably foreseeable acts of [her] co-conspirators . . . ." Id. The district court pegged the loss amount at $289,200 because that was the amount of loss caused by the conspiracy as a whole. At trial the government showed that Nieves' actions, including smuggling counterfeit bills

17

from Colombia and taking part in the East Coast spending spree, put her at the heart of the conspiracy. Her co-conspirators' conduct, then, was reasonably foreseeable to Nieves and it was not clear error to hold her responsible for it at sentencing.

Nieves also asserts that the district court based its loss calculation on Fabian's out-of-court statement that she brought back $176,000 from Colombia. She repeats her argument that using Fabian's statement at sentencing violated her right to due process. But she again misunderstands the basis of the loss calculation. The total loss of $289,200 was based on the amount of counterfeit currency seized by the government during its investigation, not on Nieves' own conduct. Fabian's statement was not relevant to the calculation, so Nieves' due process rights were not implicated.

Third, Nieves contends that the district court should have departed or varied downward from the guidelines range because she had a minor daughter with an abusive father. As an initial matter, we lack jurisdiction to review a district court's discretionary denial of a downward departure, United States v. Moran, 778 F.3d 942, 982 (11th Cir. 2015), so we will address only her downward variance argument.

18

The district court is accorded "considerable discretion" in deciding whether the sentencing factors at 18 U.S.C. § 3553(a) justify a variance. United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009). And we will overturn the court's decision only if it abused that discretion. United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008). That would require a "clear error in judgment" resulting in a sentence "outside the range of reasonable sentences dictated by the facts of the case." Id.

The district court's denial of the variance was not an abuse of discretion. It considered that Nieves had a minor daughter, but it also considered that she left her minor daughter for an extended period of time while she traveled the country passing counterfeit bills. The balancing of those two factors was within the court's discretion, and its conclusion that Nieves was not entitled to a downward variance was not an error in judgment.

Finally, Nieves contends that the district court erred by not granting a downward variance in light of the unwarranted disparity in sentences between her and her codefendants. The same abuse of discretion standard applies here. Shaw, 560 F.3d at 1238.

A disparity in sentences between codefendants in a single case is "generally not an appropriate basis for relief on appeal." United States v. Cavallo, 790 F.3d

19

1202, 1237 (11th Cir. 2015).  And it is not an appropriate basis here.  Four of Nieves' co-conspirators — Fabian, Jorge, Rodriguez, and Fuentes — pleaded guilty and cooperated with the government, justifying their shorter sentences. Santos went to trial, but there were at least two reasons for the court to give her a lighter sentence.  First, because she was not involved in the Casselberry Walmart incident, she was convicted of one less count than Nieves.  Second, there was little evidence that Santos actually smuggled counterfeit currency in from Colombia, and as a result she did not receive an increase in her offense level for part of the offense having occurred outside the United States.  There were no unwarranted sentencing disparities here.

   **AFFIRMED.**