[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-10418

————————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DENNIS THOMPSON,

Defendant-Appellant.

————————————————

Appeal from the United States District Court
for the Middle District of Georgia
D.C. Docket No. 7:21-cr-00033-HL-TQL-1

————————————————

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

PER CURIAM:

Dennis Thompson appeals his conviction for possession with intent to distribute methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). After planning a trip to Atlanta with a government informant to buy nearly a kilogram of methamphetamine, Thompson led law enforcement on a high-speed chase with a bag of the drugs lodged in the rear passenger window of his car after an unsuccessful attempt to discard it. Thompson challenges the sufficiency of the evidence and argues that the district court abused its discretion by allowing the government to reopen direct examination and by excluding a non-testifying witness's certified convictions. Because the evidence was sufficient to support the verdict and the district court's evidentiary rulings do not warrant reversal, we affirm.

## I. BACKGROUND

In August 2020, April Courson called the Lanier County Sheriff's Office to report that Dennis Thompson planned to travel to Atlanta to purchase a large quantity of methamphetamine. She told Deputies Kevin Lee and Kyle Lightsey that Thompson had asked her to drive because he did not have a driver's license. Courson identified Thompson's car as a white Ford Crown Victoria and provided its license plate. Based on that conversation, the deputies gave Courson a tracking device to place in her luggage during the trip.

On August 29, 2020, the deputies tracked the car to Atlanta using the device in Courson's luggage. Lee spoke with Courson when she arrived in Atlanta but did not record the conversation. Courson did not inform him "where they were going" or "who they were going to meet," so Lee did not notify law enforcement in Atlanta about the drug transaction. But, as the car returned to Lanier County the next day, Lee gave Sergeant Christopher Luke the car's description and license plate by radio. He instructed Luke to stop the car and to expect drugs. Luke and two deputies, Philip Hay and Katlyn Reid, positioned their patrol cars along different highways to intercept the Crown Victoria.

Luke first spotted Thompson's car. When Luke saw it driving in Hay's direction, he warned him by radio and explained that the driver had accelerated at a high speed after seeing his patrol car. Less than a minute later, Hay saw the car and observed a black bag lodged in the partially open rear window on the passenger side. Hay's dashcam footage also captured the black bag.

The deputies initiated a traffic stop, but Thompson fled. He led deputies on a high-speed chase that exceeded 120 miles per hour before stopping in Atkinson County, Georgia. The deputies detained Thompson and observed that his passenger, Courson, "appeared to be conscious, but . . . was unresponsive." Thompson told deputies that she "was having seizures," so paramedics transported her to the hospital.

Once stopped, the deputies observed that the black bag Hay had seen lodged in the rear passenger window had become caught

on the window's garment hook. The deputies called a drug-detection dog to the scene, and the dog alerted to the area near the bag. But the deputies complied with Lee's instruction "not to open anything." When Lee arrived, he searched the black bag and found a pair of men's athletic shorts, a men's wallet containing a handwritten drug ledger, and a plastic container containing contraband that appeared to be methamphetamine. Lee took the contraband to the Sheriff's Office, where it tested positive for methamphetamine. A forensic chemist later confirmed that the methamphetamine weighed between 964 and 988 grams and was 74.5 to 91.5 percent pure.

After Thompson's arrest, Lee told him that the deputies knew he had traveled to Atlanta to purchase methamphetamine and asked whether he wanted to cooperate. Thompson responded that "those people would kill you and that he had [a] family."

On July 8, 2021, a grand jury indicted Thompson for possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine. 21 U.S.C. § 841(a)(1), (b)(1)(A)(viii). Thompson pleaded not guilty.

At trial, the government first called Lee to testify. On direct examination, Lee described his role in the investigation and his conversation with Courson. He explained that he monitored the car's travel to Atlanta through the tracker and waited for it to enter Lanier County. He testified that once on the scene, he searched the black bag and found "the plastic container with the

methamphetamine." He also admitted that he had several convictions for driving under the influence and no longer served in law enforcement.

Before Lee's cross-examination, the district court told counsel that a juror had submitted a question: "Where was the tracking device located?" The district court asked the government whether it "want[ed] to reopen direct," and the government responded that it did. The district court said, "Let's let [the government] do that. Then [Thompson] can cross." Thompson objected and argued that the tracker's location was a "fact question" that "[t]he government had their chance" to ask Lee. He argued that it was "an unfair advantage for the government to respond to something that they failed to do in a juror's mind." The district court explained that "[t]he object of all legal investigation is the discovery of truth" and overruled Thompson's objection. The government reopened direct, and Lee testified that the tracker was inside Courson's luggage.

Thompson then cross-examined Lee. Thompson questioned whether Lee had properly vetted Courson as an informant. Lee testified that he had discovered Courson's convictions for "[f]inancial crimes" like cashing "[b]ad checks." When asked whether Courson's criminal history "show[ed] her two drug convictions," Lee responded that he did not recall. And he testified that although she had prior convictions, he decided to work with her because "you can't get a deacon from First Baptist to buy dope" so "[y]ou have to have people that's used to being in the game."

The government then called Luke and forensic chemist Kyle Brown as witnesses. Luke testified that Lee instructed him to "locate the vehicle and do an investigative stop on it to see if [he] could locate the drugs." Luke clarified that Lee told him about the confidential informant. Brown testified that the contraband was methamphetamine, weighed between 964 and 988 grams, and had a purity between 74.5 to 91.5 percent.

The government also called Brett McDaniel, an agent with the Federal Bureau of Investigation, as a witness. McDaniel testified that he joined the investigation after Thompson's arrest due to the drug weight. On cross-examination, Thompson asked McDaniel whether he had investigated Courson. McDaniel responded that he had and was aware of Courson's multiple convictions. Thompson asked whether he "found multiple convictions for fraudulent crimes," and McDaniel responded, "Yes, sir. I believe they were bad check charges."

After the government rested, Thompson moved for a mistrial based on the district court's reopening of direct examination to address the juror's question. The district court denied his motion. Thompson also moved for a directed verdict on the ground that there was insufficient evidence to prove possession with intent to distribute methamphetamine. The district court also denied that motion.

Thompson then informed the district court that he intended to call Myra Gilbert, an investigator with the Federal Defender's Office, to testify about Courson's criminal convictions. He sought

to introduce certified records of those convictions, under Federal Rules of Evidence 609 and 806, based on an argument that Courson was a hearsay declarant because Lee testified about her out-of-court statements. The government objected and responded that Courson was not a hearsay declarant because her statements were not offered to prove their truth. The district court sustained the objection and excluded the convictions. Thompson did not call Gilbert or any other witnesses, nor did he testify in his defense.

After deliberating for an hour, the jury returned a guilty verdict. The district court sentenced Thompson to 180 months of imprisonment to run consecutively to a state term of imprisonment in Clinch County, Georgia.

## II. STANDARDS OF REVIEW

Two standards govern our review. We review sufficiency of the evidence *de novo* and draw all reasonable inferences in the light most favorable to the government. *United States v. Futrell*, 209 F.3d 1286, 1288 (11th Cir. 2000). We review the evidentiary rulings for an abuse of discretion. *United States v. Hasner*, 340 F.3d 1261, 1274 (11th Cir. 2003). "A nonconstitutional error . . . is harmless unless it resulted in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Pon*, 963 F.3d 1207, 1227 (11th Cir. 2020) (citation and internal quotation marks omitted).

### III. DISCUSSION

We divide our discussion into three parts. First, we explain that sufficient evidence supported Thompson's conviction. Second, we explain that the district court did not abuse its discretion when it allowed the government to reopen direct examination to answer the juror's question before cross-examination. Third, we explain that any error in excluding Courson's certified convictions was harmless.

*A. Sufficient Evidence Supported Thompson's Conviction.*

Thompson argues that the evidence at trial could not support his conviction. He contends that "[t]here was no direct evidence linking [him] to possession of the drugs" and that "there was no evidence that he knowingly intended to distribute the drugs." In support, he points to the absence of "text messages or recorded phone calls to corroborate" the drug purchase, Lee's failure to contact law enforcement in Atlanta, and the government's decision not to call Courson as a witness. This argument fails.

To convict Thompson of "possession with intent to distribute methamphetamine, the government had to establish three elements: (1) knowledge; (2) possession; and (3) intent to distribute." *United States v. Mercer*, 541 F.3d 1070, 1076 (11th Cir. 2008). Possession may be actual or constructive. *United States v. Hernandez*, 433 F.3d 1328, 1333 (11th Cir. 2005). A person has "actual possession" when he exercises "direct physical control over the contraband." *United States v. Edwards*, 166 F.3d 1362, 1363 (11th Cir. 1999). "Constructive possession" exists when he has "ownership, dominion, or

control over an object itself or dominion or control over the premises . . . wh[ere] the object is concealed." *Hernandez*, 433 F.3d at 1333 (citation and internal quotation marks omitted). Both actual and constructive possession "may be exclusive or joint and may be proved by circumstantial as well as direct evidence." *United States v. Tamargo*, 672 F.2d 887, 890 (11th Cir. 1982).

The jury could have reasonably found that Thompson possessed the methamphetamine under either theory. As the driver, Thompson's control over the vehicle where the contraband was hidden established constructive possession. *See United States v. Vera*, 701 F.2d 1349, 1357 (11th Cir. 1983) ("A person who owns or exercises dominion and control over a motor vehicle . . . in which contraband is concealed may be deemed to be in constructive possession of the contraband."). And Thompson's attempt to discard the methamphetamine when he saw police established his "direct physical control over" it. *Edwards*, 166 F.3d at 1363.

As for the knowledge element, the jury also could have reasonably found that Thompson knew that he possessed the methamphetamine. We have long held that "[a]n attempt by a suspect to abandon [contraband] when capture is imminent is relevant evidence from which a jury may infer guilty knowledge." *United States v. Jimenez*, 600 F.2d 1172, 1173 (5th Cir. 1979). The law is also "entirely well settled that the flight of the accused is competent evidence against him" and has "a tendency to establish his guilt." *United States v. Borders*, 693 F.2d 1318, 1324 (11th Cir. 1982) (citation and internal quotation marks omitted); *accord United States v.*

*Kennard*, 472 F.3d 851, 855 (11th Cir. 2006). Both principles apply here because Thompson attempted to discard the bag with the drugs when he spotted the patrol car and fled from officers at speeds exceeding 120 miles per hour. As further evidence of his knowledge, the drugs were found in a black bag that also held a men's wallet, a drug ledger, and men's gym shorts. Thompson was the only man in the car, and Courson's wallet was found in her purse. And when Lee told Thompson that the deputies knew that he had traveled to Atlanta to purchase methamphetamine and asked him to cooperate after his arrest, Thompson responded that "those people would kill you and that he had [a] family."

The jury also could have reasonably found that Thompson intended to distribute the methamphetamine because of its quantity and the presence of the drug ledger. "Intent to distribute a controlled substance may be inferred from the quantity involved." *Tamargo*, 672 F.2d at 890. A jury may also "infer intent to distribute" from a "drug ledger, the amount of [the drug], [and] the lack of paraphernalia used to consume the drug." *Mercer*, 541 F.3d at 1076 (internal quotation marks omitted). Here, the methamphetamine was found with a handwritten ledger that listed buyers, prices, and transactions. McDaniel testified that one kilogram of methamphetamine is not a personal-use amount. Even a "serious" methamphetamine user would use only "a gram a day," so "976 grams would take [Thompson] two and a half years to use . . . assuming that [he] did methamphetamine every day." McDaniel also testified that the wholesale value ranged from $4,000 to $8,000 and that its retail

value ranged from $20,000 to $30,000. Together, the evidence of Thompson's possession with intent to distribute methamphetamine was sufficient to support the conviction.

### B. *The District Court Did Not Abuse Its Discretion by Reopening Direct Examination.*

Thompson argues that the district court abused its discretion when it allowed the government to reopen Lee's direct examination to answer a juror's question about the location of Courson's tracker. He contends that reopening direct examination "allowed the government a 'second bite at the apple' and unfairly prejudiced" Thompson. The government responds that the "district court did not abuse its discretion because the evidence was not closed, Thompson had an opportunity to address Lee's additional testimony during his own cross-examination of Lee, and the jury had not been charged and had not begun deliberating." We agree with the government.

"It is well established that a trial court may permit the reopening of a case" so that "omitted evidence may be presented." *United States v. Molinares*, 700 F.2d 647, 652 (11th Cir. 1983) (alteration rejected) (citation and internal quotation marks omitted). We vest "[c]onsiderable latitude in discretion . . . in the trial court in such matters." *Id*. Our predecessor court explained that "[i]t is within the sound discretion of the trial court to reopen a case and receive additional evidence . . . even after the case has been submitted to the jury." *United States v. Duran*, 411 F.2d 275, 277 (5th Cir. 1969). We ask only "whether the other side is given an adequate

opportunity to meet the additional evidence offered." *Id*. And "we will not disturb the district court's exercise of discretion unless the circumstances of the case show that [Thompson] suffered actual prejudice in the conduct of his defense." *Molinares*, 700 F.2d at 652.

The district court did not abuse its discretion. The district court reopened direct examination *before* Lee's cross-examination and the close of the evidence. Because Thompson had ample opportunity to cross-examine Lee about the tracker's location, he suffered no prejudice from the reopening of direct examination.

Thompson makes two other arguments about the reopening of direct examination that fail to persuade. First, he argues that the district court abused its discretion by not allowing Thompson "a fair opportunity to make an objection" until after its ruling. Although the district court did not invite Thompson to object, Thompson had an opportunity to—and did—object before the government reopened direct examination. The district court considered Thompson's objection and overruled it. Second, Thompson contends that the "district court never gave any instructions to the jury before the requestioning nor any cautions to the jury." Thompson did not request a limiting instruction in the district court and fails on appeal to specify what cautionary instruction the district court should have given the jury. The district court did not err in failing to give an unrequested instruction after briefly reopening direct examination to address the location of Courson's tracker.

24-10418                Opinion of the Court                13

*C. Any Error the District Court Made by*
*Excluding Courson's Certified Convictions was Harmless.*

Thompson argues that the district court abused its discretion by excluding certified records of Courson's convictions for financial crimes. Although Courson did not testify, Lee recounted several statements that Courson made to him during the investigation. Under Federal Rule of Evidence 806, a party may impeach the credibility of a non-testifying hearsay declarant in the same way that he impeaches the credibility of a testifying witness. FED. R. EVID. 806 ("When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, . . . by any evidence that would be admissible for those purposes if the declarant had testified as a witness."); *see United States v. Bovain*, 708 F.2d 606, 613 (11th Cir. 1983). And, under Rule 609, a testifying witness's credibility may be impeached by "evidence of a criminal conviction" if "the elements of the crime required proving . . . a dishonest act or false statement," regardless of the punishment. FED. R. EVID. 609(a)(2). The government responds that any error was harmless. "In the context of Rule 609, error is harmless if the witness'[s] credibility was sufficiently impeached by other evidence, or if the Government's case was strong enough to support a conviction even apart from the witness'[s] testimony." *United States v. Burston*, 159 F.3d 1328, 1336 (11th Cir. 1998).

We agree with the government that any error was harmless. Thompson impeached Courson's credibility by eliciting testimony from both Lee and McDaniel about her prior convictions for "financial crimes." And during closing argument, Thompson argued

that Courson's convictions made her untrustworthy. Because Courson's "credibility was sufficiently impeached by other evidence," the "marginal impact" of admitting certified court records of those convictions "would have been *de minimis*." *Id.* And the government presented ample evidence of Thompson's guilt independent of any statement by Courson, in any event.

## IV. CONCLUSION

We **AFFIRM** Thompson's conviction.